**TEMPLETON COAL COMPANY, INC., Sherwood–Templeton Coal Company, Inc., Princeton Mining Company, and Berwind Corporation, Plaintiffs,**

v.

**Donna E. SHALALA, Secretary, United States Department of Health and Human Services, Defendant.**

**United Mine Workers of America Combined Benefit Fund and its Trustees, Marty D. Hudson, Michael Holland, Elliot A. Segal, Thomas O.S. Rand, Carlton R. Sickles, Gail R. Willensky, and William P. Hobgood, Intervenor–Defendants.**

**No. TH 93–158–C–T/H.**

United States District Court, S.D. Indiana, Terre Haute Division.

April 4, 1995.

---

Peter Buscemi, Morgan Lewis & Bockius, Rosemary M. Collyer, Crowell & Moring, Washington, DC, Edward J. Fillenwarth Jr., Fillenwarth Dennerline Groth & Baird, Indianapolis, IN, David H. Goeller, Wilkinson Goeller Modesitt, Terre Haute, IN, John R. Mooney, Beins Axelrod Osborne Mooney & Green, Washington, DC, for plaintiff.

Gretchen E. Jacobs, Federal Programs Branch, Dept. of Justice, Washington, DC, Jill E. Zengler, Indianapolis, IN, for defendant.

## MEMORANDUM ENTRY REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

TINDER, District Judge.

This matter comes before the court upon cross motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The court, having considered the submissions and briefs of the parties, finds that Plaintiffs' motion for summary judgment should be **DENIED**, and Defendants' cross motions for summary judgment should be **GRANTED**.

### I. Factual Background and Procedural History [1]

As noted when addressing Plaintiffs' request for a preliminary injunction, this suit [2] involves a challenge to the constitutionality of a piece of federal legislation affecting the funding of health care benefits for coal industry retirees. The suit is timely in the sense that, in very recent years, Americans have undertaken a continuing public debate regarding health care costs and funding in this country. The challenged statutory scheme is the method chosen by Congress to allocate health insurance costs for one significant segment of the work force. The outcome of this suit will have no direct bearing on the focus of the broader health care debate. Nonetheless, the suit reflects the types of dilemmas facing workers and their dependents, employers and the nation's lawmakers as they address these difficult issues. The court finds, and the parties agree, that no genuine issue of material fact exists which would preclude summary judgment in the case at bar.

---

1. For a concise explanation of the historical underpinnings of the case at bar, see *Barrick Gold Exploration, Inc. v. Hudson,* 823 F.Supp. 1395, 1398–1401 (S.D.Ohio 1993), *aff'd,* 47 F.3d 832 (6th Cir.1995).

2. The court notes that this case is not unique. There have been a number of challenges raised in other courts, similar in nature to the case at bar, to the statutory scheme in question. *Barrick Gold,* 823 F.Supp. at 1395; *LTV Steel Co. v. Shalala (In re Chateaugay Corp.),* 163 B.R. 955 (S.D.N.Y.1993). *See also Unity Real Estate Co. v. Hudson,* No. 93–1802 (W.D.Pa.).

Plaintiffs in this suit are four companies that were previously involved in the coal mining business. They each were signatories to collective bargaining agreements with the United Mine Workers of America ("UMWA") in the 1950s and 1960s. Specifically, Plaintiffs Templeton Coal Company, Inc. ("Templeton"), Sherwood–Templeton Coal Company, Inc. ("Sherwood"), and Princeton Mining Company, Inc. ("Princeton") bargained with the UMWA through the Indiana Coal Operators' Association ("ICOA"), an independent multiemployer bargaining association. Plaintiff Berwind Corporation ("Berwind") (formerly known as Berwind–White Coal Mining Company) bargained with the UMWA through the Central Pennsylvania Coal Producers' Association. The Bituminous Coal Operators' Association ("BCOA"), a multiemployer bargaining association formed by many of the UMWA coal mine operators, was the primary negotiator with the UMWA after 1951. Berwind was a member of the BCOA between 1955 and 1962. The other three Plaintiffs were never BCOA members, but shadowed the BCOA's activities by membership in ICOA, a similar multiemployer bargaining association.

All four Plaintiffs were signatories to the 1950 National Bituminous Coal Wage Agreement ("NBCWA") and subsequent amendments thereto in 1951 and 1952. The NBCWA was also amended in 1955, 1956, 1958, 1964 and 1966, but Plaintiffs' connections to those agreements after 1952 varied. Templeton ceased mining operations prior to the 1955 Amendment and consequently was not a signatory to it or any subsequent amendments to the NBCWA. Sherwood and Berwind were signatories to the 1955, 1956 and 1958 Amendments. Sherwood ceased mining operations with UMWA miners in 1960. Berwind ceased coal mining altogether in 1962. Thus, Sherwood and Berwind did not sign the 1964 Amendments or any subsequent NBCWA. Princeton signed all the amendments through 1964, but ceased mining before the 1966 Amendment and did not sign any subsequent NBCWAs.

The enactment of the Coal Industry Retiree Health Benefit Act of 1992, Pub.L. No. 102–486, 106 Stat. 2776, 3036–3056 ("Coal Act"), occurred in October 1992. The Coal Act was subsequently codified at 26 U.S.C. §§ 9701 to 9722 as part of the Energy Policy Act of 1992. The Coal Act substantially affects Plaintiffs, who seek a judgment declaring that it violates the Due Process and Takings Clauses of the United States Constitution as applied to them. U.S. CONST. amend. V.

The 1950 NBCWA established the UMWA Welfare and Retirement Fund of 1950 ("1950 W & R Fund"). By the time Plaintiffs ceased mining coal with UMWA-represented employees, they each had fully complied with their obligations to contribute to the 1950 W & R Fund. The 1950 W & R Fund was created as an irrevocable trust under Section 302(c) of the Labor Management Relations Act of 1947. 61 Stat. 136. According to the 1950 NBCWA, the 1950 W & R Fund was to provide "benefits to employees of said Operators, their families and dependents for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness ... [and] benefits on account of sickness, temporary disability, permanent disability, death or retirement." (Pls.' Ex. 5 (1950 NBCWA) at 136.) Sole discretion regarding the scope and duration of the benefits that employees might receive as a result of the 1950 W & R Fund belonged to the trustees of the 1950 W & R Fund. The principal obligation of the mine operator signatories to the 1950 NBCWA, including Plaintiffs, was to contribute into the 1950 W & R Fund thirty cents per ton of coal mined. The duration of this obligation continued for the life of the agreement.

None of the amendments to the NBCWA from 1951 to 1964 changed the terms regarding the provision of health benefits to retirees under the 1950 NBCWA, except that the 1952 Amendment increased the per-ton contribution to forty cents, which carried over to the succeeding agreements. (Pls.' Ex. 7 (1952 NBCWA) at 173.) The 1964 Amendment added a requirement that eighty cents per ton be contributed for coal purchased from non-UMWA operators. (Pls.' Ex. 11 (1964 NBCWA).)

Subsequent NBCWAs through 1974 maintained the general elements of the 1950 W &

R Fund as the exclusive provider of health and other welfare benefits for both active and retired UMWA miners and their dependents. The first significant change occurred in the 1971 NBCWA when the trustees were directed to extend benefits at levels set by the BCOA and the UMWA, rather than at levels determined by the trustees as was previously done. (Pls.' Ex. 35 (1971 NBCWA) at 99.) Substantially more radical changes developed as a result of the 1974 NBCWA. That agreement converted the 1950 W & R Fund into an entity known as the UMWA 1950 Pension Trust. (Pls.' Ex. 37 (1974 NBCWA) at 84.) The 1974 NBCWA also created two other plans relevant to this proceeding:[3] the UMWA 1950 Benefit Plan and Trust ("1950 Benefit Fund") and the UMWA 1974 Benefit Plan and Trust ("1974 Benefit Fund"). (Id.) These Benefit Funds provided health and other non-pension benefits to covered miners who retired before January 1, 1976 (1950 Benefit Fund) or after January 1, 1976 (1974 Benefit Fund). The assets of the 1950 W & R Fund were transferred to the UMWA 1950 Pension Trust so that both Benefit Funds started with a zero funding base. (Id. at 83–84.) The funding for the two new Benefit Funds was to come from BCOA members and other signatories to the 1974 NBCWA. (Id. at 86–89.) However, perhaps the most revolutionary change brought by the 1974 NBCWA was the explicit promise that a covered retired miner would retain health benefits *for life*. (Id. at 99.) The class of beneficiaries entitled to benefits also was expanded to include all surviving spouses of UMWA retirees, rather than just widows of miners killed in mines as was previously the case. (Id. at 99, 103.) These changes great-

ly expanded the number of widows and disabled mine workers eligible for benefits. (Pls.' Ex. 38 (UMWA Health and Retirement Funds 1975 Annual Report) at CF 02762.)

The 1978 NBCWA brought about still more changes in UMWA retiree health benefits. As a result of the 1978 NBCWA, the source of benefits for UMWA miners who retired before January 1, 1976 continued to be the 1950 Benefit Fund. (Pls.' Ex. 42 (1978 NBCWA).) Miners who retired on or after January 1, 1976 would receive benefits from individual plans established and financed by the signatories to the 1978 NBCWA. (Id.) The 1974 Benefit Fund was relegated to providing benefits to miners who retired on or after January 1, 1976 and who were "orphaned."[4] (Id.) The 1978 NBCWA also contained what has become known as the "guarantee" clause, subsequently interpreted to obligate signatory mine operators, and signatories to all subsequent NBCWAs, to make sufficient contributions to ensure payment of the benefits that had been promised for life in the 1974 NBCWA. (Id. at 113–14.) The Plans for both the 1950 and 1974 Benefit Funds were also modified to add what has become known as the "evergreen" clause, requiring continuing contributions in connection with the 1978 NBCWA.[5]

The next NBCWA, in 1988, added withdrawal liability for signatories to that agreement. (Pls.' Ex. 43 (1988 NBCWA) at 142–45.) That liability provision required employers withdrawing from the Benefit Funds to pay an actuarially determined amount to cover the future costs of retirees "orphaned" by the withdrawal. (Id.)

During the late 1970s and 1980s, the adequacy of funding for the Benefit Funds came

---

**3.** The 1974 NBCWA also created a third plan, namely, the UMWA 1974 Pension Trust. However, that trust has no bearing upon this suit.

**4.** For purposes of the Coal Act, an "orphaned" retiree (referred to in the Act as an "unassigned beneficiary") is a retired coal miner or his or her dependent whose previous employer is no longer in existence.

**5.** The so-called "evergreen" clause amended into the 1950 Benefit Plan and Trust provides that: Any Employer who employed any Participant eligible for coverage under, or who received or

receives benefits under, the 1950 Benefit Plan and Trust, or any Employer who was or is required to make, or who has made or makes contributions to the 1950 Benefit Plan and Trust, is obligated and required to comply with the terms and conditions of the 1950 Benefit Trust, as amended from time to time, including, but not limited to, making the contributions required ... under the National Bituminous Coal Wage Agreement of 1988, as amended from time to time, and any successor agreements thereto.

(Pls.' Ex. 45 (1950 Benefit Plan and Trust) at 36.)

into question. A number of large coal operators who had signed the 1978 and subsequent NBCWAs began terminating their participation in the Benefit Funds. This put a great demand on the 1974 Benefit Fund as the retirees of these non-participating operators began to draw their benefits from the 1974 Benefit Fund in growing amounts. The remaining employers had to pay drastically increasing contributions to keep the Benefit Fund afloat. The financial burden to remaining NBCWA signatories became an ever-increasing incentive to withdraw from the Benefit Fund.

During this same era, a number of other factors also significantly impacted the UMWA health benefit funds. One, the cost of health care continued to rise. Two, there was a substantial decrease in the amount of coal being produced by NBCWA operations. Three, large numbers of miners reached retirement age while the number of mine operators dwindled. Furthermore, Plaintiffs submit that fraud and mismanagement also plagued the Benefit Fund. Regardless of the cause, a crisis was reached in the funding of coal industry retiree health benefits by the beginning of the 1990s. The controversy was most dramatically demonstrated in the protracted strike against the Pittston Coal Company and related entities. Following the settlement of that strike, the Secretary of Labor, Elizabeth Dole, formed the Coal Commission (formally known as the Advisory Commission on United Mine Workers of America Retiree Health Benefits) to examine and report on this problem. In the resulting written Coal Commission Report, as might be expected, the Commission was in substantial agreement in identifying the rising cost of paying for the "orphan" retirees as the principal cause of the mine workers healthcare funding crisis. In fact, it was projected that the 1950 and 1974 Benefit Funds would accumulate a combined deficit of $300 million by the end of 1993 if no action was taken. COAL COMMISSION REPORT: A REPORT TO THE SECRETARY OF LABOR AND THE AMERICAN PEOPLE 3 (Nov.1990) [hereinafter COAL COMMISSION REPORT]. However, there was a divergence of opinion concerning the obligation of mine operators regarding retiree health-care benefits and on how to finance those health benefits. The Report was made available to Congress to supplement other information gathered in connection with hearings held in the United States Senate on this problem. In substantial part, the 1992 Coal Act was designed to ameliorate the coal industry retiree health care funding predicament.

Only one of the three funding mechanisms created by the 1992 Coal Act is at issue in this case: specifically the UMWA Combined Benefit Fund ("Combined Fund"). 26 U.S.C. §§ 9702, 9711, 9712. The Combined Fund is a statutory merger of the 1950 Benefit Fund and the 1974 Benefit Fund. 26 U.S.C. § 9702(a)(2). On February 1, 1993, $70 million was transferred into the Combined Fund from the 1950 Pension Trust. 26 U.S.C. § 9705(a)(1)(A). This amount was used to proportionately reduce the total premium of each assigned operator. 26 U.S.C. § 9705(a)(3)(A). Thereafter, the 1950 Pension Trust transferred an additional $70 million into the Combined Fund on October 1, 1993 and another $70 million on October 1, 1994. 26 U.S.C. § 9705(a)(1)(B)–(C). Additionally, beginning on October 1, 1995 and extending through the year 2003, the Abandoned Mine Reclamation Fund will transfer up to $70 million to the Combined Fund each year in which such funds are available. 26 U.S.C. § 9705(b); 30 U.S.C. § 1232(h). These transferred funds are to be used to proportionately reduce the unassigned ("orphan") benefit premium and the death benefit premium that contributing employers would otherwise be required to pay to the Combined Fund. 26 U.S.C. § 9705(a)(3)(B). The Combined Fund is also authorized to be subsidized by health insurance premiums and death benefit premiums paid by each "assigned operator." 26 U.S.C. § 9704.

An "assigned operator" under the 1992 Coal Act is a signatory to any NBCWA since 1950. 26 U.S.C. § 9701(c)(5). Liability is to be "assigned" by the Secretary according to the beneficiaries' degree of prior employment with a signatory to any NBCWA since 1950. 26 U.S.C. § 9706(a), (b)(1). The Secretary is also required to assess a proportionate premium to each assigned operator to pay for the costs of health benefits for "unassigned beneficiaries" (e.g., "orphans"). 26 U.S.C.

§ 9704(d), (f). The signatories to the 1988 NBCWA were obligated to pay the "start-up" costs of the Combined Fund for the period February 1, 1993 to September 30, 1993; thereafter, each "assigned operator" will be charged a share of these costs and the signatories to the 1988 NBCWA will receive an offset for their start-up contributions against future funding obligations. 26 U.S.C. § 9704(g), (i)(3).

The purpose of the 1992 Coal Act is to provide funds for UMWA retiree health care benefits through the private sector. Plaintiffs emphasize that the Coal Act is premised on the specific legislative finding that:

> [T]o secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees.

Energy Policy Act of 1992, Pub.L. No. 102–486, 106 Stat. 2776, at § 19142(a)(2). As a result of the Coal Act, every coal operator, present and former, that signed any NBCWA from 1950 through 1988 and which is still in existence in any form, is obligated to contribute to the new statutory benefit fund. 26 U.S.C. §§ 9701(c)(5), 9706.

Pursuant to the Secretary's assignment process, Plaintiffs have been notified that they are responsible for paying insurance premiums for a certain number of former employees, including surviving spouses and dependents ("assigned beneficiaries") and a number of "orphans" ("unassigned beneficiaries"). For the year beginning October 1, 1993, Templeton was assigned 39 beneficiaries, resulting in an assigned premium of $138,131.35; Princeton was assigned 117 beneficiaries, resulting in an assigned premium of $419,325.17; Sherwood was assigned 4 beneficiaries, resulting in an assigned premium of $15,147.22; and Berwind was assigned 914 beneficiaries, resulting in an assigned

premium of $3,227,527.96. Obviously, these assignments and the resulting premiums will decrease over the years as beneficiaries die, but Plaintiffs argue that the liability for some beneficiaries could continue for up to thirty years.

It is this so-called "reachback" liability imposed by section 9704 of the Coal Act that is challenged in this suit. Plaintiffs contend that none of the NBCWAs they signed obligated them to make any payments toward retiree health insurance benefits after their participation in the coal mining business terminated. They build on this argument by pointing out that all of the provisions of post–1964 NBCWAs which Congress believed to be the basis for imposing "reachback liability" (*i.e.*, the lifetime duration, the "guarantee" clause, the "evergreen" provisions and withdrawal liability) were instituted in agreements entered into after Plaintiffs left the industry. Plaintiffs' position is simple—they didn't agree to this liability, and Congress can't (constitutionally) make them responsible for it. However, even after Plaintiffs stopped contributing to the 1950 W & R Fund, their retired employees, and subsequently retiring persons who had worked for Plaintiffs at various times, continued to receive benefits from the Benefit Fund. In effect, this resulted in a shift of the responsibility for financing health benefits for Plaintiffs' former employees to the coal mine operators who continued to participate in the Benefit Fund. There is a strong indication that Congress assumed that all signatories to NBCWAs since 1950 had committed lifetime health benefits to UMWA retirees without qualification.[6]

Defendants do not dispute the financial impact of the Coal Act as asserted by Plaintiffs, except that Defendants point out that fund transfers pursuant to 26 U.S.C. § 9705(a)(1) & (b) will defer, if not eliminate, Plaintiffs' actual payment obligations as to the "orphans." Nevertheless, no significant

---

**6.** Plaintiffs have pointed to multiple comments by Senators which suggest such an assumption. *See, e.g.,* 138 Cong.Rec. S10,784 (daily ed. July 29, 1992) (statement of Sen. Byrd) ("[t]his amendment ... says that when promises are made, promises will be kept"); *id.* at S10,785

(statement of Sen. Byrd) (Act's goal is "to protect the retirees who were promised lifetime benefits"); *id.* at S10,786 (statement of Sen. Wofford) ("retired miners are entitled to the health care benefits they were promised").

challenge is raised to the Plaintiffs' standing to bring this suit or the jurisdiction of this court to consider it.

The parties are also in general agreement with the historical background described by Judge Graham in *Barrick Gold Exploration v. Hudson*, 823 F.Supp. 1395, 1398–1401 (S.D.Ohio 1993), *aff'd*, 47 F.3d 832 (6th Cir. 1995). Although they may dispute whether the current state of under-funding of the miners' welfare benefits results from fraud and mismanagement or increasing costs combined with a diminution in the number of contributors to the Benefit Funds, the court finds these questions to be immaterial to resolution of the instant dispute.

Plaintiffs filed an amended complaint on December 16, 1993 seeking a judgment declaring the portion of the Coal Act that would require them to pay health insurance premiums for their former employees and a *pro rata* share of the "orphans" declared unconstitutional and enjoining the enforcement of said statute against them. They base their challenge on both the Due Process and Takings Clauses of the United States Constitution. U.S. CONST. amend. V. Their challenge is slightly different from the one raised in *Barrick Gold*, but is effectively identical to the challenge raised by the plaintiff in *Blue Diamond Coal Co. v. Shalala (In re Blue Diamond Coal Co.)*, 174 B.R. 722 (E.D.Tenn. 1994). The plaintiffs in *Barrick Gold* were also former coal mine operators who had terminated their coal mine operations *after* becoming signatories to the 1988 NBCWA. None of the Plaintiffs in this case, by contrast, have signed an NBCWA since 1964 at the latest; thus, they are situated similarly to the plaintiff in *Blue Diamond* whose last NBCWA expired in 1964. 174 B.R. at 724. A lot has happened, Plaintiffs argue, since that time to materially alter subsequent NBCWAs—specifically, the development of the 1974 Benefit Fund and the adoption of the "guarantee" and "evergreen" clauses and the contractual withdrawal-liability provision. Plaintiffs contend that their liability to former employees terminated when their employment of miners under the NBCWAs to which they were signatories ended. They argue that the Constitution precludes assessment of current liability against them because they did not agree to such exposure in the contracts they entered. Plaintiffs' constitutional challenge is clearly an attack on section 9704 only, and only to the extent "as applied" to them, rather than a facial challenge to the constitutionality of the entire statutory scheme.

## II. Summary Judgment Standard

The Seventh Circuit stated the standard for summary judgment in *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987).

> Fed.R.Civ.P. 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." When the facts are disputed, the parties must produce proper documentary evidence to support their contentions, and may not rest on mere allegations in the pleadings, *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960 [104 S.Ct. 392, 78 L.Ed.2d 336] (1983), or upon conclusory statements in affidavits. *First Commodity Traders v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985). In reviewing a grant of summary judgment, all reasonable inferences from the evidence presented must be drawn in favor of the opposing party. *Matsushita Elecs. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 [106 S.Ct. 1348, 1356, 89 L.Ed.2d 538] (1986).... The mere existence of a factual dispute will not bar summary judgment unless "the disputed fact is outcome determinative under governing law." *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.) (en banc), *cert. denied*, 464 U.S. 918 [104 S.Ct. 284, 78 L.Ed.2d 262] (1983).

*Id.* at 642.

The Supreme Court further clarified the scope of Federal Rule of Civil Procedure 56 in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In *Celotex*, the Court held that the initial

burden is on the moving party to demonstrate "with or without affidavits" the absence of genuine issues of material fact and that, absent such material facts, judgment should be granted as a matter of law in the moving party's favor. 477 U.S. at 323, 106 S.Ct. at 2553. Once the moving party has met its burden, the opposing party must "go beyond the pleadings" and designate specific facts to support or defend each element of the claim, demonstrating a genuine issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Becker v. Tenenbaum–Hill Assocs., Inc.,* 914 F.2d 107, 110 (7th Cir.1990). Not every factual dispute creates a barrier to summary judgment, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

### III. Discussion

A. Due Process Analysis

The Due Process Clause provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law...." U.S. CONST. amend. V. In considering due process challenges to economic legislation such as the Coal Act, the Supreme Court has repeatedly held that such legislation must be sustained unless Congress has acted arbitrarily or irrationally. In the Court's words:

It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

*Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976) (citing *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563, *reh'g denied,* 349 U.S. 925, 75 S.Ct. 657, 99 L.Ed. 1256 (1955)). *See also Pension Benefit Guar. Corp. v. R.A. Gray &*

*Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984).

Economic legislation comports with due process if it bears a rational relationship to a legitimate governmental purpose. *Regan v. Taxation With Representation,* 461 U.S. 540, 547, 103 S.Ct. 1997, 2001–02, 76 L.Ed.2d 129 (1983); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 83–84, 98 S.Ct. 2620, 2635–37, 57 L.Ed.2d 595 (1978); *LTV Steel Co., Inc. v. Shalala (In re Chateaugay Corp.),* 163 B.R. 955, 962 (S.D.N.Y.1993); *Colorado Springs Prod. Credit Ass'n v. Farm Credit Admin.,* 758 F.Supp. 6, 9 (D.D.C.1991), *aff'd,* 967 F.2d 648 (D.C.Cir.1992). The party "challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979). *See also Hodel v. Indiana,* 452 U.S. 314, 323, 101 S.Ct. 2376, 2382–83, 69 L.Ed.2d 40 (1981); *Association of Accredited Cosmetology Schs. v. Alexander,* 979 F.2d 859, 866–67 (D.C.Cir.1992), *vacated in part sub nom. Delta Junior College, Inc. v. Riley,* 1 F.3d 45 (D.C.Cir.1993) (finding that the provisions of the Student Loan Default Prevention Act do not violate the Due Process or Takings Clauses); *Textile Workers Pension Fund v. Standard Dye & Finishing Co., Inc.,* 725 F.2d 843, 853–54 (2d Cir.), *cert. denied sub nom. Sibley, Lindsay & Curr v. Bakery, Confectionery & Tobacco Workers Int'l Union of Am.,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984) (finding that the Multiemployer Pension Plan Amendment's Act ("MPPAA"), requiring employers to pay a proportionate share of a multiemployer pension plan's unfunded vested liabilities, does not violate the Due Process Clause); *Washington Star Co. v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, 1511 (D.C.Cir.1984) (finding that the MPPAA does not violate the Due Process Clause); *A–T–O, Inc. v. Pension Benefits Guar. Corp.,* 634 F.2d 1013 (6th Cir.1980) (upholding constitutionality of MPPAA); *Colorado Springs,* 758 F.Supp. at 9 (finding that the Agricultural Credit Act requirement that Farm Credit Assistance

Corporations must each make a one-time purchase of essentially worthless stock to shore up financially troubled Farm Credit System does not violate Due Process or Takings Clause).

■■■ A sufficient rational relationship exists so long as a "rationale Congress 'could' have had for enacting the statute can validate the legislation, regardless of whether Congress actually considered that rationale at the time the bill was passed." *United States v. Osburn,* 955 F.2d 1500, 1505 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 223, 121 L.Ed.2d 160 (1992). *See also United States v. Carolene Prods. Co.,* 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938) (stating that the court's role "must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for" the challenged legislation); *Northside Sanitary Landfill, Inc. v. City of Indianapolis,* 902 F.2d 521, 522 (7th Cir.1990) (stating that a "governmental action passes the rational basis test if a sound reason may be hypothesized" for the legislation). In enacting such economic legislation, Congress has "absolutely no obligation to select the scheme that a court later would find to be the fairest, but simply one that was rational and not arbitrary." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 477, 105 S.Ct. 1441, 1458, 84 L.Ed.2d 432 (1985). *See also Exxon Corp. v. Governor of Md.,* 437 U.S. 117, 124, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91, *reh'g denied sub nom. Shell Oil Co. v. Governor of Md.,* 439 U.S. 884, 99 S.Ct. 232, 58 L.Ed.2d 200 (1978) (noting that the "Due Process Clause does not empower the judiciary 'to sit' as a 'superlegislature to weigh the wisdom of legislation'"); *Carolene Prods. Co. v. United States,* 323 U.S. 18, 29, 65 S.Ct. 1, 7, 89 L.Ed. 15 (1944). The court "need not satisfy [itself] that the challenged rules will in fact further their articulated purposes; it is sufficient if 'the legislature could rationally have concluded that the purposes would be achieved.'" *Allright Colo., Inc. v. City & County of Denver,* 937 F.2d 1502, 1512 (10th Cir.), *cert. denied,* 502 U.S. 983, 112 S.Ct. 587, 116 L.Ed.2d 612 (1991), *and reh'g de-*

*nied,* 502 U.S. 1082, 112 S.Ct. 994, 117 L.Ed.2d 155 (1992) (citations omitted).

■■■ Additionally, "the law need not be in every respect logically consistent with its aims to be constitutional," *Williamson,* 348 U.S. at 487–88, 75 S.Ct. at 464, and legislative "line-drawing" does not violate substantive due process even if "some persons who have almost equally strong claims to particular treatment are placed on different sides of the line...." *United States v. Lee,* 957 F.2d 778, 782 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 475, 121 L.Ed.2d 381 (1992). Legislation "does not offend due process simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Das v. Sullivan,* 789 F.Supp. 324, 326 (N.D.Cal. 1992), *aff'd,* 17 F.3d 1250 (9th Cir.1994) (quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)). *See also Colorado Springs,* 758 F.Supp. at 10 ("There is no requirement that the burden imposed by legislation be exactly proportionate to the benefits received."). Nor does the fact that the final version of an Act is the result of considerable legislative compromise suggest that it is irrational. *Lyng v. International Union,* 485 U.S. 360, 363, 108 S.Ct. 1184, 1188, 99 L.Ed.2d 380 (1988).

■■■ The burden is on Plaintiffs, in bringing their complaint alleging a due process violation, to establish that Congress acted in an arbitrary and irrational way in connection with economic legislation. *See, e.g., id.* at 15; *Ferguson,* 372 U.S. at 726, 83 S.Ct. at 1029; *Williamson,* 348 U.S. at 487–88, 75 S.Ct. at 464–65. Great deference is paid to the legislative decisions of Congress. Plaintiffs' due process challenge can prevail only if they show the questioned statute to be arbitrary, discriminatory or demonstrably irrelevant to the policy the legislature is free to adopt. *Nebbia v. New York,* 291 U.S. 502, 539, 54 S.Ct. 505, 517, 78 L.Ed. 940 (1934). The statute must stand if a rational relationship exists between it and a legitimate governmental objective. *Id.* at 537, 54 S.Ct. at 516.

Accordingly, the broad extent of congressional power is limited only by the constraints of a rational relationship between the enactment and an appropriate goal of government. Given the low level of scrutiny applied to federal legislation allocating the burdens and benefits of economic life, it is not surprising that virtually every substantive due process challenge to economic legislation has failed since *Railroad Retirement Bd. v. Alton R.R. Co.*, 295 U.S. 330, 354, 55 S.Ct. 758, 764, 79 L.Ed. 1468 (1935), the continuing vitality of which has been severely questioned. *Peick v. Pension Benefit Guar. Corp.*, 724 F.2d 1247 (7th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984). The string of unsuccessful challenges to economic legislation seems endless. *See, e.g., Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust*, —— U.S. ——, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *R.A. Gray*, 467 U.S. at 717, 104 S.Ct. at 2709; *Turner Elkhorn*, 428 U.S. at 1, 96 S.Ct. at 2882. Some even speculate that economic regulations can never be found to be irrational. *Central States Pension Fund v. Lady Baltimore Foods, Inc.*, 960 F.2d 1339, 1343 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992). Nevertheless, Plaintiffs seek to focus on several aspects of the Coal Act in order to distinguish this case from the hordes of other failed endeavors.

First, Plaintiffs frame their argument as though the Coal Act is retroactive legislation as applied to them. Simply put, they contend that their sole commitment to funding health benefits was a fixed per-ton contribution and the last ton giving rise to such an obligation was mined decades ago. Analogizing to the subsequently created pensions in *Alton*, Plaintiffs contend that the retiree health benefits are the supplementation of an earlier wage already paid to the retirees. If the legislation is retroactive, a greater justification will be required in a due process test. *Turner Elkhorn*, 428 U.S. at 17, 96 S.Ct. at 2893. Nevertheless, in order to mount a successful due process challenge to the Coal Act's "reachback" provisions, Plaintiffs must demonstrate that there is no rational relationship between that part of the legislation and an appropriate governmental goal.

Plaintiffs are assessed liability for retiree health benefits because of their prior coal mining activity under NBCWAs. However, the use of previously existing facts to regulate subsequent action is not necessarily retroactive legislation. *Reynolds v. United States*, 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934) ("A statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends ... are drawn from a time antecedent to the enactment."); *Cox v. Hart*, 260 U.S. 427, 435, 43 S.Ct. 154, 157, 67 L.Ed. 332 (1922) ("A statute is not made retroactive merely because it draws upon antecedent facts for its operation."). When a statute merely relates to current and future conditions and neither punishes past wrongdoing nor imposes liability for past acts, the statute simply is not retroactive. *United States v. South Carolina Recycling & Disposal, Inc.*, 653 F.Supp. 984, 996 (D.S.C.1984), *aff'd in part and vacated in part sub nom. United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988), *and cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). In other words, liability imposed for present and future conditions arising out of past conduct is not *per se* retroactive. *United States v. Northeastern Pharmaceutical & Chem. Co.*, 810 F.2d 726 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987).

The Coal Act is simply not "retroactive" for purposes of due process analysis. *See, e.g., Metropolitan Property & Casualty Ins. Co. v. Rhode Island Insurer's Insolvency Fund*, 811 F.Supp. 54, 58 (D.R.I.1993) (finding a state insurance insolvency act not retroactive despite application of insurer assessments to claims traceable to pre-enactment insolvencies); *South Carolina Recycling*, 653 F.Supp. at 996 (finding remedial environmental legislation premised on present and future effects of landowners' past actions "not 'retroactive' in constitutional [due process] sense").

Plaintiffs further argue that passage of the Coal Act was not "foreseeable" when they last employed UMWA minework-

ers in the 1950s and early 1960s and that it otherwise upset their "settled expectations" that the NBCWAs to which they were signatory in years past would forever delimit their health care obligations to their UMWA retirees. (Mem. in Supp. of Pls.' Mot. for Summ.J. at 13–16, 21–22.) The Supreme Court, however, has never embraced a foreseeability or expectation-based model for substantive due process analysis. Whether or to what extent a particular piece of legislation dashes a parties' economic "expectations" generally poses no constitutional impediment since *all* economic legislation— whether labelled prospective or retroactive— inherently disrupts *someone's* financial expectations. *See* LON L. FULLER, THE MORALITY OF THE LAW 60 (1964) (quoted with approval in *Landgraf v. USI Film Prods.*, —— U.S. ——, —— n. 24, 114 S.Ct. 1483, 1499 n. 24, 128 L.Ed.2d 229 (1994) ("If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever.")).[7] In this respect, the Court's comments in *Concrete Pipe* affirming the MPPAA's imposition of statutory withdrawal liability on certain employers applies equally to Plaintiffs' complaints against the Coal Act:

> [I]t may be that the liability imposed by the Act ... was not anticipated at the time of actual employment. But our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.... This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.

—— U.S. at ——, 113 S.Ct. at 2287 (citations omitted).

 Moreover, while Plaintiffs repeatedly cite the Supreme Court's recent decision in *Landgraf* as authority for a retroactivity test based upon whether an enactment attaches "new" legal duties or consequences to past transactions, (Mem. in Supp. of Pls.' Mot. for Summ.J. at 5–7), *Landgraf* repre-

sents no such change in substantive due process jurisprudence. At issue in *Landgraf* was whether or not Congress intended the retroactive application of the newly-available employment discrimination remedies (*i.e.,* compensatory and punitive damages) under the Civil Rights Act of 1991 to apply retroactively to cases pending at the time of its enactment. —— U.S. at ——, 114 S.Ct. at 1492. Finding that the Act's legislative history lacked an unambiguous expression of congressional intent regarding the temporal scope of the Act, the Court declined to give retroactive effect to the statute's remedial provisions in light of the general presumption that statutes are not to be given retroactive effect absent a clear congressional command. *Id.* at ——, 114 S.Ct. at 1505.

Given *Landgraf's* focus on statutory interpretation rather than substantive due process, it has little, if any, applicability to this action. *Landgraf* promulgated a rule of statutory construction, not constitutionality. Here, unlike the Civil Rights Act at issue in *Landgraf,* there can be no question as to Congress' intent. The Coal Act clearly and unambiguously provides that *any* operator signatory to any NBCWA may be subject to premium obligations for its UMWA retirees and dependents and a proportional share of any "orphan" employees and their dependents. 26 U.S.C. §§ 9701, 9706(a). Thus, whatever may be said for the role played by considerations of "settled expectations" and "reasonable reliance" in *Landgraf's* calculus for divination of congressional intent, such considerations play little, if any, part in the appropriate characterization of Coal Act premiums as "retroactive" or "prospective" in the constitutional sense. Indeed, while *Landgraf* does not cite to the seminal substantive due process trilogy of *Turner Elkhorn, R.A. Gray* and *Concrete Pipe,* the Court nevertheless invokes the spirit of those cases when noting that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment ... or upsets

---

7. As the Court observed in *Landgraf,* even uncontroversially prospective legislation may unsettle expectations and impose burdens on past conduct. "[A] new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property; a new law banning gambling harms the person who had begun to construct a casino before the law's enactment...." *Landgraf,* —— U.S. at —— n. 24, 114 S.Ct. at 1499 n. 24.

expectations based in prior law." —— U.S. at ——, 114 S.Ct. at 1499. Plaintiffs' reliance on *Landgraf's* "new legal duty or consequence" discussion is thus misplaced.

In the end, Plaintiffs' characterization of the Coal Act as imposing "new" legal duties in the form of statutory premium obligations is nothing more than a conclusory label that fails to advance their position. In the broadest sense, all legislation, by its very nature, necessarily imposes some "new" legal duties and obligations. Thus, while true that the Coal Act imposes a *statutory* premium obligation that did not exist prior to its enactment, it is also equally true that signatory operators have been paying *contract-based* health care "premiums" for active and retired UMWA miners, in the form of royalties on tonnage mined or man hours worked, since the inception of the first UMWA health and retirement fund in 1946.' The Coal Act therefore represents merely an "adjustment" to signatory operators' existing or pre-existing contractual obligations to fund health care benefits for UMWA miners and retirees. Because the Coal Act does not write on an historical blank slate, but merely provides for a prospective statutory continuation of collectively-bargained health care premium payments for UMWA miners dating back nearly half a century, the Act imposes neither "new" nor "retroactive" legal duties on Plaintiffs in the constitutional sense. Regardless, retroactivity alone would not doom the Coal Act under the Due Process Clause. *Turner Elkhorn,* 428 U.S. at 16, 96 S.Ct. at 2892–93. Even retroactive application of an economic burden may be based upon a rational legislative purpose. *R.A. Gray,* 467 U.S. at 717, 104 S.Ct. at 2709.

Plaintiffs also strenuously argue that the agreements they signed contained nothing more than defined contribution requirements, setting a per-ton amount to be paid into a welfare plan for a finite period of time, specifically, for the term of the agreements. Distribution of the benefit proceeds was left entirely to the trustees' discretion and Plaintiffs made no commitment that reasonably could be construed to have promised, suggested or implied that the welfare benefits, or the funding for those benefits, would continue for the lives of Plaintiffs' former employees or their dependents. They also point to the fact that the plan to which Plaintiffs contributed, the 1950 W & R Fund, was effectively dissolved and folded into the UMWA 1950 Pension Trust by the 1974 NBCWA. Plaintiffs further contend that all of the commitments made by coal mine operators that have given rise to claims of lifetime welfare benefits by retirees—*i.e.,* the "guarantee" clause, the "evergreen" clause and withdrawal liability—were made by other operators in agreements signed ten years and more after any Plaintiff last signed an NBCWA. Plaintiffs further contend that they never committed to funding welfare benefits for spouses or the "orphans" who were not directly employed by them. They argue that these substantial expansions of coverage occurred well after Plaintiffs had moved from mining UMWA mines on to other endeavors.

Plaintiffs' due process challenge gains nothing from their reliance on the language of the now-expired NBCWAs in the 1950s and 1960s limiting their UMWA health and pension contributions to the duration of those particular collective bargaining agreements. (*See, e.g.,* Mem. in Supp. of Pls.' Mot. for Summ.J. at 5, 12–15, 18.) Congress' legislative horizon cannot be eclipsed by private contractual terms or disclaimers. *Concrete Pipe,* —— U.S. at —— ——, 113 S.Ct. at 2288–89 (federal economic legislation reviewed for rationality only and not subject to Contract Clause constraints); *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 223–24, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986) ("Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity."); *R.A. Gray,* 467 U.S. at 733, 104 S.Ct. at 2719–20.

Plaintiffs' contract-based argument is no longer viable in light of *Concrete Pipe.* At issue in *Concrete Pipe* was the constitutionality of MPPAA provisions imposing statutory withdrawal liability on an employer who was otherwise protected from contribution obli-

gations to a multiemployer pension trust by contractual disclaimer. —— U.S. at —— ——, 113 S.Ct. at 2286–89. Like Plaintiffs here, the withdrawing plaintiff-employer sought refuge in the language of the Trust Agreements expressly providing that pension benefits were not guaranteed, that benefits were payable only to the extent that sufficient assets existed, and that the employer's sole obligation was to make pension contributions specified in the collective bargaining agreement. *Id.* at —— & n. 24, at 2288 & n. 24. Soundly rejecting the notion that private contracts present a due process bar to congressional action, the Court in *Concrete Pipe* held that federal economic legislation is only subject to review for rationality irrespective of the terms of any private agreements.

 Plaintiffs have simply failed to show that it was irrational for Congress to determine that operators under the NBCWAs of the 1950s and 1960s remain, at least in some part, responsible for retiree health benefit liabilities. The dispute about when lifetime health benefits were promised to retired mine workers, and by whom, is a multi-sided contest, pitting coal mine operators from different eras against one another, as well as involving present and former mineworkers and their families. A congressional decision to come down on the side of the retirees and their spouses and dependents is not totally void of reason. It may not be the best or fairest choice, but it is not irrational or arbitrary in the constitutional sense.

> The *Turner Elkhorn* case is highly instructive here. That case involved a Due Process challenge to the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972. In that legislation, Congress required coal operators to pay the medical costs of their former employees who were suffering from black lung disease, even though these employees had terminated their work in the industry before the Act was passed and even though the operators had never contracted to pay such compensation. The Supreme Court found that the Black Lung Benefits Act rationally spread the costs of the employees' disabilities to those who had profited from their labor. The same

reasoning can be applied to the facts of this case. Congress has chosen to spread the costs of the Combined Fund's benefits to those employers who profited from the labor of UMWA miners and who, at some time in their histories, had contributed to multi-employer welfare benefit funds.

*Blue Diamond,* 174 B.R. at 727.

Plaintiffs attempt to distinguish *Turner Elkhorn* by arguing that the Black Lung compensation scheme made each operator responsible only for the expenses related to its own workers, whereas the Coal Act imposes liability for the "orphans" with whom Plaintiffs had no direct employment connection. However, this argument ignores the fact that Plaintiffs benefitted from the pool of available UMWA workers, even if they only hired some of them. The availability of health-care benefits may have contributed to the existence of that workforce pool. Furthermore, Plaintiffs' narrow reading of *Turner Elkhorn* ignores subsequent recognition of pooled responsibilities. *See Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2264.

The fact that Congress acted reasonably in imposing Coal Act premium obligations on all NBCWA signatories is confirmed by the findings of the Coal Commission and several district courts holding that early NBCWA signatories such as Plaintiffs, no less than NBCWA signatories in the 1970s and 1980s, helped foster retirees' legitimate expectations in lifetime health care benefits. *See, e.g., United Mine Workers of Am. v. Nobel,* 720 F.Supp. 1169, 1178 (W.D.Pa.1989), *aff'd without opinion,* 902 F.2d 1558 (3d. Cir. 1990), *and cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991) (finding promise of lifetime health benefits to UMWA retirees based, *inter alia,* on "25-year history of lifetime benefits prior to 1974"); *Grubbs v. United Mine Workers of Am.,* 723 F.Supp. 123, 125 (W.D.Ark.1989) ("Since the 1950's retired mine workers have been provided with health benefits as a *vested lifetime benefit* under the UMWA Welfare and Retirement plan.") (emphasis added). *See also LTV Steel,* 163 B.R. at 961; *Barrick Gold,* 823 F.Supp. at 1402, 1405; COAL COMMISSION REPORT at vii–viii, 1.

■ Plaintiffs' assertion that the Coal Act embodies an "indiscriminate" and "faulty" congressional assumption that early signatories "promised" lifetime health benefits to UMWA retirees thus falls short of the mark. The relevant constitutional question is not whether Plaintiffs in fact made an express contractual "promise" of lifetime health benefits, but, rather, whether Congress had plausible grounds upon which to include signatory operators such as Plaintiffs within the Coal Act's financing scheme. It could be that "[t]he assumptions underlying these rationales [are] erroneous, but the very fact that they are 'arguable' is sufficient on rational-basis review, to 'immunize' the congressional choice from constitutional challenge." *Federal Communications Comm'n v. Beach Communications, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2096, 2104, 124 L.Ed.2d 211 (1993) (citation omitted). *See also Heller v. Doe,* —— U.S. ——, —— – ——, 113 S.Ct. 2637, 2649–50, 125 L.Ed.2d 257 (1993).

■ Plaintiffs' attack on the rationality of the Coal Act's "reachback" to early NBCWA signatories, moreover, fails to take into account the nature of multiemployer plans such as the UMWA Benefit Trusts. All NBCWA signatories, whether last signatory to an NBCWA in 1950 or 1988, once employed UMWA retirees and provided them with portable service credits toward vested health and pension benefits.[8] As a consequence, any participating employer's withdrawal eroded the Trusts' contribution base without a concomitant decrease in the beneficiary population. Plaintiffs' claim that neither their retirees nor the UMWA Benefit Trusts suffered any "detriment" from their withdrawal from the multiemployer plan.[9]

(Mem. in Supp. of Pls.' Mot. for Summ.J. at 13–14, 19–20.) This ignores the fact that other NBCWA signatories were then forced to shoulder the lifetime health care costs of *Plaintiffs'* retirees and dependents. This same scenario was replayed dozens of times over the years as increasing numbers of coal operators dumped their UMWA retirees on the UMWA Benefit Trusts' eroding contribution base. *See generally Concrete Pipe,* —— U.S. at ——, —— – ——, 113 S.Ct. at 2271, 2287–88 (noting cost and risk-sharing features of multiemployer plans); *R.A. Gray,* 467 U.S. at 721 & nn. 2–3, 104 S.Ct. at 2713 & nn. 2–3 (discussing problem of so-called "inherited liabilities" in ongoing multiemployer plans with declining contribution bases).

Plaintiffs' withdrawal from the UMWA multiemployer plan, no less than the withdrawal of other employers occurring in later years, therefore contributed in some measure to the financial demise of the UMWA Benefit Trusts. Faced with the task of stabilizing the funding of UMWA retiree health benefits, Congress thus reasonably looked to all NBCWA signatory operators for premium contributions. As the Supreme Court recently noted in rejecting a due process challenge to retroactive economic legislation: "It is surely proper for Congress to legislate retrospectively to ensure that costs of a program are borne by the entire class of persons that Congress rationally believes should bear them." *United States v. Sperry Corp.,* 493 U.S. 52, 65, 110 S.Ct. 387, 396, 107 L.Ed.2d 290 (1989). *See also R.A. Gray,* 467 U.S. at 730, 104 S.Ct. at 2718 (finding it rational for Congress to retroactively apply MPPAA withdrawal liability provisions to prevent premature employer exodus); *Turner Elk-*

---

**8.** As the Supreme Court noted in *Concrete Pipe,* the nature of multiemployer plans dictates that it is the provision of portable service credits by participating employers, rather than the actual vesting of benefits, which provides the relevant due process inquiry. —— U.S. at ——, 113 S.Ct. at 2287. ("In determining whether the imposition of [MPPAA] withdrawal liability is rational, then, the relevant question is not whether a withdrawing employer's employees have vested benefits, but whether an employer has contributed to the plan's probable liability by providing employees with service credits.").

**9.** Plaintiffs' "detriment" argument is derived from Justice O'Connor's concurring opinions in *Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2292, and *Connolly,* 475 U.S. at 229, 106 S.Ct. at 1028, wherein she expressed her view that imposition of MPPAA-based employer withdrawal liability would be unconstitutional "in the absence of any connection between the employer's conduct and some detriment to the employee." *Connolly,* 475 U.S. at 229, 106 S.Ct. at 1028 (O'Connor, J., concurring). *Accord Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2292 (O'Connor, J., concurring). The court notes that this position has yet to command the support of a majority of the Court.

*horn,* 428 U.S. at 18, 96 S.Ct. at 2893 (rejecting substantive due process challenge to retroactive provisions of Black Lung Benefits Act based on a finding that the "imposition of liability for effect of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor"); *Monsanto,* 858 F.2d at 173–74 (rejecting constitutional challenge to environmental statute imposing remedial cleanup costs on pre-enactment disposal activities irrespective of timeframe in which such disposals occurred).

■ To the extent that Congress could have found that mine operators who terminated welfare contributions in the 1950s and 1960s "dumped" their future retirees on the operators who continued to make contributions, a legislative decision to recognize responsibility for that "dumping" cannot be said to be totally irrational. There may be many parties responsible for the under-funded condition Congress found the mine worker retiree health plans to be in as it addressed the problem in 1992. It is not an appropriate function of the courts to evaluate whether Congress most correctly and fairly assessed the blame for that crisis when it enacted the Coal Act. Plaintiffs' due process challenge must fail because they have failed to demonstrate that responsibility was placed on them in a completely irrational manner.

■ Plaintiffs further attack the Coal Act as imposing premium obligations that are substantially out of proportion to their experiences with the UMWA Benefit Trusts in the 1950s and 1960s. Specifically, Plaintiffs contend that the Coal Act impermissibly requires them to "underwrite benefits that were never available in the 1950s and 1960s when Plaintiffs mined coal, to persons who were never beneficiaries under the 1950 W & R Fund, and to miners (and their spouses and dependents) who never worked for Plaintiffs. (Mem. in Supp. of Pls.' Mot. for

Summ.J. at 20.) The court finds this argument to be without merit.[10]

Plaintiffs' blanket assertion that the Coal Act requires them to underwrite health care benefits beyond those available under the UMWA Benefit Trusts in the 1950s and 1960s is simply mistaken. The 1950 UMWA Welfare and Retirement Fund to which Plaintiffs contributed during their signatory years provided a comprehensive health benefits package covering unlimited hospitalization, out-patient treatment and rehabilitation expenses. (Defs.' Supp. Ex. 15 (1953 UMWA Welfare and Retirement Fund Operating Manual) at VI–2000 to VI–5000); (Defs.' Supp. Ex. 16 (1958 UMWA Welfare and Retirement Fund Operating Manual) at VI–2000 to VI–5000); (Defs.' Supp. Ex. 17 (1961 UMWA Welfare and Retirement Fund Operating Manual) at IV–2000 to IV–5000.) Persons eligible for a UMWA "health card" included pensioned UMWA retirees and their wives, widows and dependents under eighteen years of age of deceased miners, and relatives of deceased miners caring for miners' orphaned children. (Defs.' Supp. Ex. 15 (1953 UMWA Welfare and Retirement Fund Operating Manual) at VI–1000 to VI–1001); (Defs.' Supp.Ex. 16 (1958 UMWA Welfare and Retirement Fund Operating Manual) at VI–1000 to VI–1107); (Defs.' Supp.Ex. 17 (1961 UMWA Welfare and Retirement Fund Operating Manual) at IV–1000 to IV–1208.) Such coverage provisions do not differ markedly from the benefits currently provided to Combined Fund beneficiaries. *See* 26 U.S.C. § 9703(b); (Pls.' Ex. 43 (1988 NBCWA) at 145–64.)

■ Plaintiffs further claim that their Coal Act obligations are not reflective of their NBCWA experiences since they were "strangers" to the 1950 and 1974 UMWA Benefit Trusts from which the Combined Fund was formed. (Mem. in Supp. of Pls.' Mot. for Summ.J. at 7, 11–12, 14, 20.) While it is true that Plaintiffs never contributed to the immediate predecessor trusts to the Combined Fund, they fail to establish why

---

10. The court notes that Plaintiffs have yet to be assessed any Combined Fund premiums for UMWA retirees with whom they never shared an employment relationship. No signatory operators—including Plaintiffs—have been assessed any unassigned beneficiary premiums for either the first or second plan years as the transfers from the UMWA 1950 Pension Plan have proven sufficient to cover the health care costs of these orphaned retirees.

such a fact presents an issue of constitutional significance. Plaintiffs bear no responsibility for eliminating pre-Act deficits in the 1950 and 1974 UMWA Benefit Trusts; only 1988 NBCWA signatories are statutorily tasked with making deficit reduction contributions. 26 U.S.C. § 9704(i)(1)(B).

Plaintiffs, moreover, are hardly strangers to UMWA multiemployer plans, having collectively contributed to the 1950 W & R Fund for over twenty years. Indeed, aside from the formalistic reconfiguration of the trust structure in 1974, the benefit program administered by the 1950 and 1974 UMWA Benefit Trusts (as established by the 1974 NBCWA) largely mirrored that of the 1950 W & R Fund. Plaintiffs' claim of being "strangers" to the 1950 and 1974 UMWA Benefit Trusts is nothing more than an exercise in form over substance.

Plaintiffs appear to be laboring under the assumption that due process demands precise conformity between their Coal Act obligations and their collective-bargaining experiences under the UMWA Benefit Trusts. Congress, however, need not legislate with mathematical precision in the economic arena so long as there is a rational fit between justification and means. *Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2288. *See also Turner Elkhorn,* 428 U.S. at 19, 96 S.Ct. at 2894; *Washington Star,* 729 F.2d at 1510–11. Due process affords Congress considerable flexibility in determining how to spread the costs of ensuring UMWA retiree health benefits among participants (and former participants) in various UMWA multiemployer benefit trusts.

Finally, Plaintiffs contend that the Coal Act amounts to an improper and unnecessary congressional "bailout" of 1988 signatory operators who made express contractual promises (through the so-called "guarantee" and "evergreen" clauses) to fund lifetime health benefits for UMWA retirees and dependents.[11] (Mem. in Supp. of Pls.' Mot. for Summ.J. at 9, 12–13, 18.) The Coal Act, however, presents a rational approach to the problem of securing UMWA retiree health benefits that does not impermissibly favor 1988 signatory operators at the expense of earlier NBCWA signatories.

The essential premise of the Coal Act's financing scheme is one of proportionality. Signatory operators bear the financial responsibility for the health care costs of assigned Combined Fund beneficiaries and their *pro rata* share of any "orphaned" beneficiaries. Statutory transfers from the 1950 Pension Fund and the Abandoned Mine Reclamation Fund are also applied on a *pro rata* basis to reduce (or, as has occurred in the first and second plan years, effectively eliminate) a signatory's unassigned beneficiary premium. 26 U.S.C. § 9705(a)(3)(B), (b)(2). Such a proportional financing scheme may hardly be said to unfairly discriminate among classes of NBCWA signatories.

Several Coal Act provisions, moreover, serve to moderate the premium obligations of pre–1978 NBCWA signatories such as Plaintiffs. First, the Act's assignment hierarchy reflects a statutory preference for assigning beneficiaries to signatories of the 1978 NBCWA or subsequent coal wage agreements. 26 U.S.C. § 9706(a)(1)–(3). Assignments are made to pre–1978 signatories only

---

**11.** Plaintiffs' post-hoc allegation that the imposition of Coal Act premium obligations upon early NBCWA signatories was "unnecessary" to the financial stabilization of the UMWA Benefit Trusts, (Mem. in Supp. of Pls.' Mot. for Summ.J. at 20–21), fundamentally misapprehends the wide latitude afforded Congress when crafting economic legislation. Congress could well have concluded during the legislative process that a more narrowly defined class of signatory operators would have proven insufficient to rescue the UMWA Benefit Trusts from financial insolvency. *See* STAFF OF HOUSE COMM. ON WAYS AND MEANS, 103D CONG., 1ST SESS., FINANCING UMWA COAL MINER "ORPHAN RETIREE" HEALTH BENEFITS 24–27 (Comm. Print 1993) [hereinafter FUNDING "ORPHAN RETIR-

EES"]. Such a legislative conclusion is not subject to post-enactment empirical verification. *Beach Communications,* —— U.S. at ——, 113 S.Ct. at 2098 (stating that legislative choices are "not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data"). In any case, financial and actuarial data presented at the Senate Coal Act hearings in September 1991 suggested that limiting the "reachback" provision to 1978 and later NBCWA signatories would still leave a significant number of beneficiaries—those whose last employer last signed an NBCWA prior to 1978—remaining in the 1950 Benefit Trust as "orphans." *See, e.g.,* FUNDING "ORPHAN RETIREES" at 24–27.

as a default condition when no later signatory employed a particular UMWA retiree. *Id.* Second, 1988 signatories alone bear the responsibility for retiring the pre-Act deficits of the UMWA multiemployer plan. That the Coal Act contains such moderating provisions only serves to underscore the rationality of Congress' approach for financing UMWA retiree health benefits. *See Connolly,* 475 U.S. at 225 & n. 8, 106 S.Ct. at 1026 & n. 8 (noting MPPAA provisions mitigating economic impact on individual employers); *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 367 n. 12, 100 S.Ct. 1723, 1729 n. 12, 64 L.Ed.2d 354, *reh'g denied,* 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1137 (1980) (noting congressional attempt to moderate impact of ERISA liability).

Yet even taking Plaintiffs' congressional "bailout" argument at face value, it nonetheless fails to undermine the constitutionality of the Coal Act. This court is not permitted to second-guess the wisdom of Congress' chosen funding scheme by suggesting other scenarios (such as limiting "reachback" liability to post–1978 NBCWA signatories) which might have been potentially wiser or fairer under the circumstances. As the Supreme Court noted in *Turner Elkhorn,* due process demands only that federal economic legislation "approaches the problem of cost spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension." 428 U.S. at 19, 96 S.Ct. at 2894. *See also Ferguson,* 372 U.S. at 730–32, 83 S.Ct. at 1031–32; *Williamson,* 348 U.S. at 488, 75 S.Ct. at 464–65; *Long Island Oil Prods. Co., Inc. v. Local 553 Pension Fund,* 775 F.2d 24, 27 (2d Cir.1985) ("It is not the judiciary's task to balance the economic costs and benefits of a challenged Act, or to measure it against a particular social or economic philosophy.").

Plaintiffs' challenge to the Coal Act is effectively an attempt to recast a political battle into a constitutional mold. Stabilization of the funding base for UMWA retirees presented a multi-sided contest pitting coal operators of different eras against one another. All members of the coal industry, past and present, were afforded an ample opportunity to participate in the legislative process culminating in passage of the Coal Act. Not only did both the Coal Commission and the Senate Subcommittee on Medicare and Long–Term Care conduct public hearings, but no less than seven legislative measures proposing various means of funding UMWA retiree health benefits were introduced in the 102d Congress prior to passage of the Coal Act. *See* FUNDING "ORPHAN RETIREES" at 52–56 (summarizing the legislative history of the Coal Act). That Plaintiffs in their opinion "lost" this policy battle provides no solid ground for a constitutional challenge:

> The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.

*Vance,* 440 U.S. at 97, 99 S.Ct. at 942–43 (footnote omitted). *Accord Beach Communications,* —— U.S. at ——, 113 S.Ct. at 2101.

In reviewing the Coal Act, this court is not limited to measuring the law against the stated purpose. Instead, the court may appropriately question whether the legislation serves any *hypothetical* legitimate purpose. *Northside Sanitary Landfill,* 902 F.2d at 522. Here, the legislation stands up to Plaintiffs' due process challenge measured by either the stated purpose or a hypothesized reason. It holds those responsible, if only in part, liable. Congress is well within its authority in viewing the history of collective bargaining in the mining industry to determine that operators like Plaintiffs here created an atmosphere that promised lifetime health benefits to those who would retire from the industry. In return, such operators benefitted from the existence of a qualified work force. While Plaintiffs have presented many good arguments demonstrating that Congress may not have made the best choice available in imposing a portion of the financial burden for the Combined Fund upon pre–1978 NBCWA signatories, they have failed to show that Congress' choice was either arbitrary or irrational. The burden placed on Plaintiffs by the Coal Act is cer-

tainly more rational than selecting cattle ranchers or used car dealers to pay for UMWA retiree health benefits. Plaintiffs did work in the industry at one time. This fact, even in the absence of all the other reasons discussed *supra*, would be enough to keep Plaintiffs' connection to the current financial obligation from being considered either arbitrary or void of reason.

## B. Takings Clause Analysis

■ The Takings Clause of the Fifth Amendment prohibits the government from taking private property for public use without paying the former owner just compensation. *Nixon v. United States*, 978 F.2d 1269, 1275 (D.C.Cir.1992). The Supreme Court has consistently said that the Takings Clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, *reh'g denied*, 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)). *See also Dolan v. City of Tigard*, — U.S. ——, ——, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994); *Colorado Springs*, 967 F.2d at 654 (citing cases).

Nevertheless, the Supreme Court has also made clear that "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). The Court has "recognized, in a wide variety of contexts[ ] that government may execute laws or programs that adversely affect recognized economic values." *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. at 2659. Indeed, as the Court stated in *United States v. Locke*, 471 U.S. 84, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985):

> Even with respect to vested property rights, a legislature generally has the power to impose new regulatory constraints on the way in which those rights are used, or to condition their continued retention on

performance of certain affirmative duties. As long as the constraint or duty imposed is a reasonable restriction designed to further legitimate legislative objectives, the legislature acts within its powers in imposing such new constraints or duties....

*Id.* at 104, 105 S.Ct. at 1797. Thus, for purposes of constitutional review under the Taking Clause:

> [V]ested economic rights are held subject to the Government's substantial power to regulate for the public good the conditions under which business is carried out and to redistribute the benefits and burdens of economic life.

*Id.* at 105, 105 S.Ct. at 1798.

In discussing the appropriate standard to determine whether economic legislation violates the Takings Clause, the Court has stated that there is no set formula, and that it relies upon "*ad hoc*, factual inquiries into the circumstances of each particular case." *Connolly*, 475 U.S. at 224, 106 S.Ct. at 1025 (1986). Nevertheless, the Court has identified three factors as having particular significance:

> (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action.

*Id.* at 225, 106 S.Ct. at 1025 (citations omitted). When confronted with challenges to statutes involving economic regulatory legislation, the Court has consistently applied these factors and concluded that the statutory scheme passes constitutional muster. *See Penn Cent.*, 438 U.S. at 125, 98 S.Ct. at 2659–60; *Sperry Corp.*, 493 U.S. at 52, 110 S.Ct. at 389.

The Supreme Court's decisions in *Connolly* and *Concrete Pipe* directly control this case. When *Connolly* came to the Court in 1985, the Court has already rejected a Due Process Clause challenge to the MPPAA in *R.A. Gray*. *Connolly* presented a Takings Clause challenge to the same statute. An employer, together with the trustees of an affected multiemployer pension plan, argued that the MPPAA violated the Takings Clause "by requiring employers to transfer their

assets for the private use of pension trusts and, in any event, by requiring an uncompensated transfer." 475 U.S. at 221, 106 S.Ct. at 1024. In a unanimous decision, the Court rejected this argument stating that:

[A]ppellants' submission—that such a statutory liability to a private party always constitutes an uncompensated taking prohibited by the Fifth Amendment—if accepted, would prove too much. In the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefits others.... Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another.

*Id.* at 222–23, 106 S.Ct. at 1025.

The Court likewise rejected the employer's argument that the MPPAA deprived it of the benefits of contractual protection from any liability beyond the specified contributions to which the employer had agreed, holding that:

If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions. For the same reason, the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking.... [H]ere, the United States has taken nothing for its own use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose.

*Connolly,* 475 U.S. at 224, 106 S.Ct. at 1025 (citations omitted).

After applying the regulatory takings factors, the Court determined that the MPPAA did not constitute a taking in violation of the Fifth Amendment, even though the employees who benefited from the Act's requirements might have no employment relationship whatsoever with an employer affected by the law. In discussing the nature of the government action, the Court reasoned that, under the MPPAA, the government does not physically invade or permanently appropriate any of the employers' assets for its own use.

475 U.S. at 225, 106 S.Ct. at 1026. Instead, the Court concluded that the MPPAA merely protects pension plan participants by requiring withdrawing employers to pay their share of a multiemployer pension plan's unfunded vested obligations incurred during that employer's participation in the plan. *Id.* The Court found:

This interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation.

*Id.* (citations omitted).

In considering the severity of the MPPAA's economic impact, the Court recognized that there was "no doubt that the Act completely deprives an employer of whatever amount of money it is obligated to pay to fulfill its statutory liability." *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026. The Court stressed, however, that "[t]he assessment of withdrawal liability is not made in a vacuum ... but directly depends on the relationship between the employer and the plan to which it had made contributions." *Id.* The Court also found it significant that the MPPAA contains several provisions that moderate and mitigate the economic impact of an individual employer's liability, *id.* at 225–26, 106 S.Ct. at 1026–27, much like the mitigating provisions the court has already noted within the Coal Act. *See supra* pp. 819–820.

Finally, the Court considered whether the MPPAA interfered with employers' reasonable investment-backed expectations. In concluding that the statute did not, the Court reasoned that the employers had voluntarily elected to participate in a multiemployer pension plan when they knew or should have known not only that the multiemployer pension plan arena was subject to extensive federal regulation, but also that their withdrawal might trigger additional financial obligations. *Connolly,* 475 U.S. at 227, 106 S.Ct. at 1027. Thus, the court explained:

"Those who do business in the regulated field cannot object if the legislative scheme

is buttressed by subsequent amendments to achieve the legislative end." ...

We are far from persuaded that fairness and justice require the public, rather than the withdrawing employers and other parties to pension plan agreements, to shoulder the responsibility for rescuing plans that are in financial trouble.... We see no constitutionally compelled reason to require the Treasury to assume the financial burden of attaining this goal.

*Id.* at 227–28, 106 S.Ct. at 1027 (citations omitted).

A unanimous Supreme Court rejected a further Takings Clause challenge to the MPPAA in *Concrete Pipe*. —— U.S. at ——–——, 113 S.Ct. at 2289–92. The Court began with the proposition, previously stated in *Connolly*, that, in light of the deficiencies in the employer's due process arguments, " 'it would be surprising indeed to discover' the challenged statute nonetheless violat[ed] the Takings Clause." *Id.* at ——, 113 S.Ct. at 2289 (quoting *Connolly*, 475 U.S. at 223, 106 S.Ct. at 1025). After again reviewing the three factors in *Connolly*, *Penn Central*, and other Takings Clause decisions, the Court found no taking and no constitutional violation. Emphasizing that the employer had voluntarily chosen to participate in the multiemployer plan, the Court held that, "[i]n light of the relationship between Concrete Pipe and the Plan, we find no basis to conclude that Concrete Pipe is being forced to bear a burden 'which, in all fairness and justice, should be borne by the public as a whole.' " —— U.S. at ——, 113 S.Ct. at 2292 (quoting *Armstrong*, 364 U.S. at 49, 80 S.Ct. at 1569).

▮▮▮ Application of the principles set forth in *Connolly* and *Concrete Pipe* to the facts of this case leads to the inescapable conclusion that the Coal Act does not effect a "taking" and does not violate the Takings Clause. First, with respect to the nature of the governmental action involved—*i.e.*, requiring assigned operators to pay a share of the costs of providing health care benefits to UMWA retirees—Congress has not physical-

ly invaded nor permanently appropriated any of the affected operators' assets for the government's own use. *See LTV Steel*, 163 B.R. at 962. Instead, by requiring assigned operators to finance health benefits for the Coal Act's beneficiaries, Congress has merely enacted legislation designed to ensure the continuation of a health benefits program from which many assigned operators had attempted to walk away. This requirement does not give rise to any claim for just compensation under the Takings Clause. *See Sperry*, 493 U.S. at 62 n. 9, 110 S.Ct. at 394–95 n. 9 (finding that the state's deduction of judicial user fees from settlement awards was not a physical occupation requiring just compensation); *Atlas Corp. v. United States*, 895 F.2d 745, 756 (Fed.Cir.), *cert. denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990) ("Requiring money to be spent is not a taking of property.").

▮▮▮ Second, with respect to the severity of the Coal Act's impact, although it unquestionably "deprives an employer of whatever amount of money it is obligated to pay to fulfill its statutory liability," *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026, the Coal Act imposes liability that is directly related to the employment relationship between each NBCWA signatory and their previous employees and a proportionate share of the health benefits of orphan retirees.[12] This aspect of the statute is very similar to the previously upheld provisions of the MPPAA which require employers withdrawing from a multiemployer pension plan to pay a proportionate share of the plan's unfunded vested liabilities, including liabilities owed to employees whom the withdrawing employers never employed. As noted, Congress carefully weighed the alternatives and expressly determined that the costs of providing health care for orphan retirees are most fairly borne by all NBCWA signatories that remain in existence.

▮▮▮ The Supreme Court in *Connolly* acknowledged that the economic impact of the MPPAA withdrawal liability provision could

12. To the extent that *Dolan v. City of Tigard* is applicable to the case at bar, the employment relationship between each NBCWA signatory and

its previous employees is sufficient to constitute the required "essential nexus" for Takings Clause purposes. —— U.S. at ——, 114 S.Ct. at 2317.

be harsh. The Court noted, however, that various provisions of the MPPAA moderated the impact on individual employers, and it found that "[t]here is nothing to show that the withdrawal liability actually imposed on an employer will always be out of proportion to its experience with the plan. . . ." *Connolly*, 475 U.S. at 226, 106 S.Ct. at 1026–27. This language indicates that the vagaries of individual cases do not necessarily weigh significantly in a court's Takings Clause analysis.[13] *See Spring Branch Mining Co., Inc. v. UMWA 1950 Pension Trust & 1950 Pension Plan*, 691 F.Supp. 973, 979–80 (D.W.Va. 1987), *aff'd*, 854 F.2d 37 (4th Cir.1988), *and cert. denied*, 488 U.S. 1019, 109 S.Ct. 817, 102 L.Ed.2d 806 (1989) (withdrawal liability of $1.2 million not a taking).

Furthermore, just as the employers in *Connolly* and *Concrete Pipe* voluntarily elected to participate in multiemployer pension plans to reap the economic benefits of providing promised benefits through the use of pooled assets, all NBCWA signatories, at one time or another, assumed responsibility for providing health benefits to UMWA retirees, and voluntarily chose to finance that obligation by pooling their assets in multiemployer benefit plans. The Coal Act simply obligates those signatories to pay their fair share of the benefits for the retirees through a new, statutorily-imposed, multiemployer arrangement. The character of the congressional decision to allocate responsibility for this economic burden to former participants in the industry is no different in character from the liability constitutionally imposed for Black Lung disease benefits, pension funding, and environmental contamination. *See Barrick Gold*, 823 F.Supp. at 1405. As pre-viously noted, while Plaintiffs were engaged in the business of mining coal, they benefitted from the pool of available UMWA workers, even if [they] only hired some of them. Accordingly, Congress is well within its authority, viewing the history of collective bargaining in the mining industry, to determine that operators like these Plaintiffs created an atmosphere that promised lifetime health benefits to those who would retire from the industry. Thus, as with the imposition of withdrawal liability in *Connolly*, any assessment against Plaintiffs "is not made in a vacuum," 475 U.S. at 225, 106 S.Ct. at 1026, but depends upon the earlier relationship between Plaintiffs, the UMWA Funds and the UMWA retirees. While Plaintiffs may take issue with Congress' scheme in apportioning responsibility for providing benefits to the retirees, the court cannot find that the scheme has no rational connection to Plaintiffs' earlier participation in the UMWA Funds and the concomitant obligations they undertook to the UMWA Funds' beneficiaries. *See LTV Steel*, 163 B.R. at 960 ("[T]he amount of the payments required of plaintiffs are directly related to the number of beneficiaries of the Combined Fund that were, in fact, employed at one time by plaintiffs, and are proportionate to plaintiffs' activities under the NBCWAs.").

Finally, the Coal Act cannot be said to so interfere with the reasonable investment-backed expectations of former NBCWA signatories to the extent required to constitute a violation of the Takings Clause. Although Congress' power to address the retiree health care crisis in the coal industry does

13. Even if the relatively harsh impact of a statute on an individual company is deemed critical to a Takings Clause analysis, a comparison between the Coal Act and the provisions of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, is instructive. Under CERCLA, any release of materials defined as hazardous waste under the statute, no matter how small the release and no matter when it occurred, can result in joint and several liability for the entire cost of cleaning up the site where the release occurred. In other words, even the release of a *de minimis* amount of hazardous waste, done years before, can result in a party's liability under CERCLA for millions of dollars in cleanup costs. *See United States v. Kramer*, 757 F.Supp. 397, 423 (D.N.J.1991) ("CERCLA does not permit a *de minimis* defense to liability"). Nevertheless, Due Process and Takings Clause challenges to CERCLA, similar to those now made against the Coal Act, have been similarly rejected by the courts. *See United States v. Northeastern Pharmaceutical and Chem. Co.*, 810 F.2d 726, 734 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987) (rejecting both due process and takings challenges, holding that Congress acted rationally in "imposing liability for the cost of cleaning up such site upon those parties who created and profited from the sites and upon the chemical industry as a whole.").

not depend upon the existence of a promise of lifetime benefits, the Coal Commission, several federal courts and even coal industry representatives have recognized that such an implied promise did, in fact, exist.

For example, Charles A. Owen, a trustee of the 1950 W & R Fund representing the coal mine owners, in a release issued to all 1950 NBCWA signatories on November 5, 1951, noted that the W & R Fund provided for the payment of "Hospitalization, Surgical and Medical Care for mine workers, including pensioners, and dependents *during his life, without limit as to duration....*" (Defs.' Ex. Y at 2 (emphasis added).)

Similarly, federal courts consistently have held that the UMWA retirees are entitled to lifetime health benefits. For example, in *Nobel*, 720 F.Supp. at 1169 the court held that:

> The language of the plan benefits contained in the past five collective bargaining agreements between the UMWA and the BCOA, providing that a pensioner 'will be entitled to retain a health services card for life,' *together with the 25–year history of lifetime benefits prior to 1974*, and the testimony of the parties of record establish that the parties intended to provide health benefits to the individual plaintiffs for life. We find that the language confers a right to benefits for the lifetime of the pensioner.

720 F.Supp. at 1178 (emphasis added). The Court in *Nobel* also found:

> Pension benefits for retired miners were provided beginning in 1947, under the previous trust, and health benefits were provided to retired miners beginning no later than 1950. *The pension and health benefits for retired miners were provided throughout the life of the miner. The eligibility of the retired miner to receive pension and health benefits from the 1950 Fund was not affected by whether the last employer ceased operations, went out of business, or failed to become signatory to successor agreements.*

*Id.*, 720 F.Supp. at 1173 (emphasis added). *See also District 29, United Mine Workers of Am. v. United Mine Workers of Am. 1974 Benefit Plan & Trust*, 826 F.2d 280, 282 (4th Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988) ("[W]e agree with the district court's conclusion that the intentions of the parties in providing for retirement health benefits was to guarantee their provision for life."); *In Re Chateaugay Corp.*, 945 F.2d 1205, 1210 (2d Cir.1991), *cert. denied*, 502 U.S. 1093, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992) ("[R]etired employees are guaranteed the provision of health benefits for life under the collective bargaining agreement."); *Barrick Gold*, 823 F.Supp. at 1402; *LTV Steel*, 163 B.R. at 960.

Additionally, Plaintiffs cannot argue that government regulation of the type created by the Coal Act was totally unexpected. In a 1953 speech, Joseph E. Moody, the president of the Southern Coal Producers' Association, envisioned that the federal government could assume responsibility for continuing the UMWA multiemployer benefit arrangement in the event that the private fund became insolvent. Moody stated that:

> I hesitate to speculate on what might happen if the Coal Welfare Fund again goes broke. It is certain that the mine operators, already operating at a loss, cannot increase the royalty payment. Instead, it should be lowered.

> But depriving some 400,000 persons of benefits they have been promised and grown accustomed to, could be political as well as social dynamite. It is entirely conceivable that Congress, with an eye to the danger of complete disruption of the domestic coal industry—and to the votes involved—might decide it was necessary to step in and take over the mines, assuming responsibility for the welfare collections and payment. After all, the government has seized the coal mines four times in recent years—just as it has seized the railroads and steel mills in times it considered that national emergencies existed, because of major labor troubles.

> Even under government seizure, of course, the welfare fund as it stands today could only be reactivated under government subsidy—and this of course, would only be the first step toward nationalization of coal, and toward socialization of American Industry.

Perhaps legislation by Congress is necessary to proscribe [sic] sound restrictions under which such benefit plans can operate; but, if it is, we as business men and Americans must see that such legislation is passed.

(Defs.' Ex. BB at 15.)

Thus, given the fact of continued provision of health care to UMWA-represented retirees, as well as the pervasive nature of the government's regulation of virtually every facet of the coal mining industry, multiemployer benefit funds in general, and the UMWA Funds in particular, any expectation that any NBCWA signatory may have had that it could freely and forever walk away from its responsibilities to the UMWA retirees, and dump its share of the liabilities onto operators that were still contributing to the UMWA 1950 and 1974 Benefit Trusts, was clearly unreasonable. Because Plaintiffs have failed to satisfy any of the three factors suggested by *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026, or, for that matter, suggested any other viable basis upon which to build a successful Takings Clause challenge, the court finds that this portion of Plaintiffs' claim must fail as well.

### IV. Conclusion

In mounting a constitutional challenge to an Act of Congress, a plaintiff must establish a violation more substantial than the mere allegation that the method chosen by Congress to correct a particular problem was not the best method available. The courts of the United States do not sit in judgment of legislative prerogative, so long as that prerogative has some rational basis and is not so invasive as to constitute a "taking." In the instant case, for the reasons stated above, Plaintiffs have failed to meet their heavy burden of establishing that the Coal Act is violative of either the Due Process or Takings Clauses of the Fifth Amendment to the United States Constitution. Whether the Coal Act is the fairest or most reasonable solution to the problems Congress sought to resolve is a question for politicians, philosophers and editorialists, not for this court. Accordingly, Plaintiffs' motion for summary judgment is hereby **DENIED** and Defendants' cross-motions for summary judgment are hereby **GRANTED**. Judgment will be entered in a separate order accompanying this opinion.