In re **BLUE DIAMOND COAL COMPANY, Debtor.**

**BLUE DIAMOND COAL COMPANY**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, and ... Trustees of the United Mine Workers' of America Combined Benefit Fund.**

No. CIV–3–93–473.

United States District Court, E.D. Tennessee, at Knoxville.

Nov. 9, 1994.

Dan D. Rhea, Lewis R. Hagood, Arnett, Draper & Hagood, Knoxville, TN, for Blue Diamond Coal Co.

Pamela G. Steele, U.S. Dept. of Justice, Office of U.S. Atty., Knoxville, TN, Brian G. Kennedy, Gretchen E. Jacobs, U.S. Dept. of

Justice, Civ. Div. Federal Programs Branch, Washington, DC, for Donna E. Shalala.

G.W. Morton, Jr., Morton & Morton, Knoxville, TN, Jami Wintz McKeon, Peter Buscemi, Morgan, Lewis & Bockius, Paul A. Green, John R. Mooney, Edward M. Gleason, Jr., Beins, Axelrod, Osborne, Mooney & Green, P.C., David W. Allen, UMWA Health and Retirement Funds, Office of the Gen. Counsel, Washington, DC, for Trustees of United Mine Workers of America Combined Ben. Fund.

## OPINION

HULL, District Judge.

This is an adversary proceeding in which Blue Diamond Coal Company, a reorganized Chapter 11 Debtor, challenges the constitutionality of the "super-reachback" provision of the Coal Industry Retiree Health Benefit Act of 1992 (the Coal Act), 26 U.S.C. §§ 9704(a)(3). All parties have moved for summary judgment; the issues have been fully briefed; and the case was heard on oral argument on Monday November 7, 1994. The Court makes the findings of fact and conclusions of law which follow.

## I. BACKGROUND

Blue Diamond runs bituminous coal mining and mining-related operations in Kentucky and Tennessee through several wholly-owned subsidiary companies. Between 1947 and 1964, Blue Diamond employed members of the United Mine Workers of America (UMWA)[1] and, pursuant to various National Bituminous Coal Wage Agreements (NBCWAs), made contractually defined royalty payments to a multiemployer welfare and retirement fund that operated on a pay-as-you-go basis. This fund promised its beneficiaries no permanent or perpetual benefits. In fact, beneficiaries of this plan were specifically told that benefits were revocable and not vested. The continuation of benefits at any future time was entirely contingent upon

the receipt of sufficient tonnage royalty revenues from the participating operators. Blue Diamond's last UMWA contract expired in April of 1964. Since that time, it has made no contributions to any UMWA benefit trust or done anything which would give any of its current or former employees a reasonable expectation of lifetime health benefits from any UMWA trust funds.

In response to the passage of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1381, mandating that pension funds be fully funded on an actuarial basis, the National Bituminous Coal Wage Agreement of 1974 restructured the existing UMWA benefit trust, dividing it into four separate trusts, only two of which are relevant to this lawsuit. One was the UMWA 1950 Benefit Plan and Trust which provided health benefits to miners who retired before January 1, 1976, and their dependents, including retirees from Blue Diamond. The other was the UMWA 1974 Benefit Plan and Trust which provided health benefits to both active miners and miners who retired after January 1, 1976, and their dependents.

By the late 1970s, a combination of demographic and economic factors began to adversely impact the financial stability of these UMWA benefit trusts. In the 1980s, many coal companies went out of business or otherwise ceased contributing to the funds, effectively dumping their retirees into the beneficiary population and forcing the remaining, participating employers to shoulder increasingly large contribution obligations to pay not only for their own retirees but also for these newly "orphaned" retirees. The increasing financial instability of the trusts, coupled with the economic disruption heralded by the strike of the Pittson Coal Company, lead Congress to seek a legislative solution to the problem. In March of 1990, then-Secretary of Labor Elizabeth Dole established the bi-partisan Advisory Commission on Mine Workers Retiree Health Benefits

---

1. The United Mine Workers of America is a labor organization representing coal industry mine workers throughout North America. For more than forty years, it has entered into a series of successive collective bargaining agreements known as National Bituminous Coal Wage Agreements with the Bituminous Coal Operators' Association, Inc., a multiemployer bargaining association established in 1951 that represents various large and small bituminous coal operators in collective bargaining with the UMWA.

which eventually produced the Coal Commission Report. The Coal Commission found, among other things, that the retired miners were entitled to the health care benefits that had been promised to them and that such commitments must be honored. It recommended either an industry-wide funding plan broadly taxing all current coal operators, or a more limited arrangement funded by past and present NBCWA signatories only—possibly reaching back to the "signatory class of 1978." The report did not suggest that pre-ERISA signatories of NBCWAs like Blue Diamond had ever promised lifetime health care benefits or that they should be included in the "reach back" provision.

The Coal Act which eventually passed is undeniably good legislation designed to ensure the continuation of health benefits for tens of thousands of retired coal miners and their dependents.[2] It seeks to rescue from insolvency the two UMWA Welfare Benefit Trust Funds which were established in 1974, after the passage of ERISA. It does so by combining the two funds into a newly created "Combined Fund" and requiring *all* past employer signatories to NBCWAs to finance the Combined Fund's benefits. In other words, the legislation goes beyond the reachback suggested by the Coal Commission, which would have involved only post-ERISA signatories of collective bargaining agreements, to encompass coal companies such as Blue Diamond that have not signed NBCWAs since well before ERISA required vested benefits.

The Coal Act requires the Secretary of Health and Human Services to identify retired coal mine employees and their dependents who were entitled to health care benefits under the 1950 UMWA Benefit Fund and the 1974 Benefit Fund and to assign those beneficiaries to coal operators, such as Blue Diamond, on the basis of the operators' former contractual obligations to the former welfare retirement funds. The Coal Act imposes its obligations in proportion to a signatory operator's past experience in the industry and, under its assignment hierarchy, implicitly recognizes that coal operators signing post-ERISA collective bargaining agreements should bear the responsibility, in the first instance, for UMWA retiree health benefits. Only when the Secretary cannot assign a beneficiary to a more recent signatory does the Act look to pre-ERISA coal operators, such as Blue Diamond, to make beneficiary assignments. In addition, under the Coal Act, the Secretary may also assess Blue Diamond, and other operators, additional premiums, over and above the premiums assessed for beneficiaries specifically assigned to them, for their proportional share of "orphans," a class of beneficiaries with respect to whom the Secretary is unable to make assignments to specific coal operators. Of the 1,133 miners currently assigned to Blue Diamond by the Secretary, only 74 had actually retired from Blue Diamond when its last UMWA contract expired in 1964. (These retirees have been receiving health benefits from the UMWA 1950 Benefit Fund for the last twenty-eight years). The bulk of the retirees currently assigned to Blue Diamond worked for it at some point in their careers but actually retired from other employers.

## II. THIS CASE

In this lawsuit, Blue Diamond alleges that the Secretary's imposition of assessments will cost it $4.9 Million Dollars in its first year alone; that its potential liability is approximately $25 Million Dollars; and that the Act deprives it of property without due process of law, and without just compensation, in violation of the Due Process and "Takings" clauses of the Fifth Amendment to the United States Constitution. It also charges that the Coal Act retroactively deprives it of legitimate contractual expectations, effectively rewriting long-expired UMWA wage agreements and requiring it to pay more compensation to its former employees than originally bargained for. It likens the Coal Act, as applied, to a retroactive minimum wage law that would require employers to give *former* employees a raise.

The Coal Act is predicated on a congressional finding that,

---

**2.** The Coal Act does not provide health benefits to coal industry retirees who were never members of the United Mine Workers of America.

in order to secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify *persons most responsible for plan liabilities* in order to stabilize plan funding and allow for the provision of health care benefits to such retirees. Pub.L. 102–486, Section 19142. (emphasis added)

Blue Diamond's entire argument is that, if a coal operator never signed an NBCWA after 1974, it cannot possibly be one of the "persons most responsible" for the liabilities of the two post-ERISA trust funds the plan seeks to salvage. It points out that the Coal Commission recommended the legislation because it found that the miners had been *promised* lifetime benefits and that this commitment should be honored. Only those employer signatories to post-ERISA NBCWAs can be said to have ever actually promised lifetime health benefits to their retirees and their dependents. Blue Diamond contends that, unless it can be shown to have caused the liability of the UMWA health care programs by contractually promising retirement health care benefits, the Constitution prohibits Congress from retroactively holding it responsible for funding those benefits now in any manner other than a general tax upon society as a whole. In other words, it would have this Court find that it is unconstitutional to assign beneficiaries and assessments of premium liabilities to pre-ERISA signatories of contracts with the UMWA who never promised lifetime health benefits to their UMWA retirees.

### A. The Due Process Challenge

█ The Due Process Clause of the United States Constitution provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." In considering Due Process challenges to economic legislation, the Supreme Court has held repeatedly that such legislation must be sustained unless Congress has acted arbitrarily or irrationally. "[L]egislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and ... the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). This deferential standard applies even if the legislation readjusting benefits and burdens upsets otherwise settled expectations or imposes a new duty or liability based on past acts. *See: Turner Elkhorn*, 428 U.S. at 16, 96 S.Ct. at 2893. As long as "a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." *Pension Benefits Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984).

█ What these cases tell us is that, in order to mount a successful Due Process challenge to the Coal Act's super-reachback provision, Blue Diamond must show that there is no rational relationship between that part of the legislation and an appropriate government goal. In other words, it must show that there is nothing in its past conduct that would make it rational to consider it "responsible" for the "plan liabilities." This it cannot do. The best Blue Diamond can do is show that, in extending the reachback provision beyond that recommended by the Coal Commission, Congress apparently erroneously believed that Blue Diamond and other contributors to pre-ERISA welfare and retirement funds had actually or effectively promised lifetime benefits to retirees and their beneficiaries. However, the actual Congressional finding which is mentioned in the legislation is not that Blue Diamond and others like it had actually *promised* benefits but that they bore "responsibility" for the "plan liabilities." There is no doubt that, to some extent, they did. By ceasing to contribute to the UMWA trust fund after its contractual requirement to do so had expired, Blue Diamond created some of the "orphans" who became the responsibility of the remaining contributing operators. These orphaned miners continued to draw upon the funds and contributed to their financial instability.

The *Turner Elkhorn* case is highly instructive here. That case involved a Due Process challenge to the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972. In that legislation, Congress required coal operators to pay the medical costs of their former employees who were suffering from black lung disease, even though these employees had terminated their work in the industry before the Act was passed and even though the operators had never contracted to pay such compensation. The Supreme Court found that the Black Lung Benefits Act rationally spread the costs of the employees' disabilities to those who had profited from their labor. The same reasoning can be applied to the facts of this case. Congress has chosen to spread the costs of the Combined Fund's benefits to those employers who had profited from the labor of UMWA miners and who, at some time in their histories, had contributed to multi-employer welfare benefit funds.

### B. The Takings Clause Challenge

■ The Takings Clause of the Fifth Amendment prohibits the government from taking property for public use without paying the former owner just compensation. It is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978). However, there are "a wide variety of contexts ... [in which] government may execute laws or programs that adversely affect recognized economic values." *Id.* at 124, 98 S.Ct. at 2659. "[V]ested economic rights are held subject to the Government's substantial power to regulate for the public good the conditions under which business is carried out and to redistribute the benefits and burdens of economic life." *United States v. Locke*, 471 U.S. 84, 105, 105 S.Ct. 1785, 1798, 85 L.Ed.2d 64 (1985). There is no set formula for determining whether economic legislation violates the Takings Clause. Courts normally consider the economic impact of the regulation on the challenging party; the extent to which the regulation has interfered with its distinct investment-backed expectations; and the character of the governmental action. *See Connolly v. Pension Ben. Guaranty Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986).

The *Connolly* case involved an unsuccessful Takings Clause challenge to the "withdrawal liability" amendments to ERISA in the Multiemployer Pension Plan Amendments Act of 1980 (MMPAA). After carefully considering the regulatory takings factors, the Supreme Court found that the MMPAA did not constitute a taking, even though the employees who benefitted from the Act's requirements might have had no employment relationship whatsoever with the employer affected by the law. The Court found that, the MMPAA's "interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and ... does not constitute a taking requiring Government compensation." 475 U.S. at 225, 106 S.Ct. at 1026. The Court made similar findings in another Takings Clause challenge, *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust*, —— U.S. ——, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993). The reasoning in the *Connolly* and *Concrete Pipe* cases can, of course, be applied to the facts of the instant case. However, it is important to note that in both *Connolly* and *Concrete Pipe*, the plaintiffs had voluntarily participated in ERISA-regulated, "defined benefit" pension plans at a time when contingent employer withdrawal liability for unfunded vested benefits was already imposed by the ERISA law as it existed when the plaintiffs signed up. The challenged amendments in the MMPAA simply made employer withdrawal liability automatic and unlimited, immediately upon an employer's withdrawal from a multi-employer defined benefit plan. The "taking" in those cases was upheld because of the employers' previous association with their ERISA plans.

■ In order to survive a Takings Clause challenge under the terms of both *Connolly* and *Concrete Pipe*, the Coal Act must rest on some conduct on Blue Diamond's part that would make it rational to hold it responsible

for the health benefits to be covered by the Combined Fund. Blue Diamond's conduct, that subjects it to liability under the Coal Act, consisted of employing UMWA members between 1947 and 1964, and making contractually defined and limited royalty contributions to a multiemployer welfare and retirement fund that operated on a pay-as-you-go basis. It is not at all clear that this is a constitutionally sufficient basis for liability. In the Court's opinion, Blue Diamond's Takings Clause challenge has considerable appeal.

■ Of the three factors found by the *Connolly* court to be of particular significance to a Takings Clause challenge, the first is, of course, the economic impact of the regulation upon the claimant. It is undisputed that the Coal Act "takes" $4.9 Million Dollars of Blue Diamond's money in the first year alone and it may end up taking as much as $25 Million before Blue Diamond's assigned beneficiaries expire. This is a gross, uncompensated taking whose severe economic impact must be recognized. Any analysis of the first factor must strongly support Blue Diamond's position.

The second *Connolly* factor is the extent to which the regulation has interfered with distinct investment-backed expectations. The Secretary suggests that it was unreasonable for Blue Diamond to believe that its 1964 National Bituminous Coal Wage Agreement would forever limit its responsibility to the UMWA benefit trusts. Maintaining economic stability in the coal industry has long been a matter of federal concern. Blue Diamond should not be surprised that Congress acted in 1992 to avert the crisis in the 1950 and 1974 Benefit Trusts which threatened to disrupt coal production and deprive UMWA retired miners of their long-expected lifetime health benefits. The Court agrees that it was reasonably foreseeable that Congress would take action to ensure that the UMWA benefit trust would remain solvent and capable of meeting its obligations. But it was a good deal less foreseeable that the legislation chosen to solve the problem would reach back to conduct which occurred almost 30 ago in order to enforce a "promise" Blue Diamond never actually made. The best that

can be said for the Secretary's argument is that Blue Diamond had to have known that its own retirees were among the many "orphans" drawing benefits from the UMWA trusts and contributing to their financial instability. The second factor also favors Blue Diamond, but less emphatically.

. The third factor to be considered is the "character" of the Coal Act. The Secretary suggests that the nature of the governmental action in the Coal Act is indistinguishable from the MPPAA withdrawal liability provisions which the Supreme Court found not to constitute a taking in *Connolly*. She points out that neither MPPAA nor the Coal Act permits the government to physically invade or permanently appropriate any of the employer's assets for its own use. Rather, both statutes implement a "public program that adjusts the benefits and burdens of economic life to promote the common good" and therefore do not constitute a taking requiring government compensation. The defendant Trustees, in their brief, also point out that, to the maximum extent possible, the Coal Act imposes liability that is directly related to the employment relationship between each assigned operator and the Combined Fund's beneficiaries. With regard to the assignment of "orphans," they suggest that Congress carefully weighed the alternatives and expressly determined that the costs of providing health care for orphan retirees would be most fairly borne by those NBCWA coal operators who voluntarily chose to participate in a multiemployer health care system and presumptively derived a *quid pro quo* in collective bargaining from their agreement to do so.

With regard to the Secretary's assignment of retirees who actually worked for it in the past, Blue Diamond concedes that it has received the "fruits of their labor" (echoing the legal basis upon which a Takings Clause challenge failed in the *Turner Elkhorn* case). However, it points out that the Combined Fund created by the Coal Act also provides benefits to wives, widows and dependents of miners who never worked in the coal mines. It has not enjoyed the fruits of *their* labor. Blue Diamond contends, generally, that the true "character" of the Coal Act, as applied

to it, is that of a statute justifying a gross property deprivation solely by means of a fiction—a presumed promise of benefits which was never actually made.

The Court fully understands Blue Diamond's argument that it made no promise of lifetime benefits and, therefore, did not contribute to the UMWA benefit funds' legal liability. But it *did* contribute to the problem which the Coal Act attempts to solve because its own retirees are beneficiaries of the Combined Fund. The Court is mindful that the Takings Clause is designed to bar the government from forcing some people to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. And it is by no means clear that, in all fairness and justice, the public rather than past and present NBCWA signatories, should shoulder the responsibility for rescuing the 1950 and 1974 UMWA Benefit Trusts and for ensuring that retired UMWA miners receive the lifetime health benefits promised to them by later NBCWA signatories. It is a coal industry problem which should be solved by the coal industry. Coal operators like Blue Diamond contributed to the problem and should be part of the solution. In other words, an analysis of the third *Connolly* factor favors upholding the constitutionality of the challenged legislation.

The Court notes that the constitutionality of the Coal Act has already been subjected to Due Process and Takings Clause challenges in *LTV Steel Co., Inc. v. Shalala (In re Chateaugay)*, 163 B.R. 955 (S.D.N.Y.1993); *Templeton Coal Co. v. Shalala*, 855 F.Supp. 990 (S.D.Ind.1993); and *Barrick Gold Exploration, Inc. v. Hudson*, 823 F.Supp. 1395 (S.D.Ohio, 1993). All three district courts upheld the constitutionality of the Coal Act. The *LTV Steel* and *Barrick* cases were not brought by operators who, like Blue Diamond, have been nonunion since before 1974. However, the *Templeton* case, like the one before this Court, was brought by operators who last signed NBCWAs in the 1950s and early 1960s.

The *Templeton* court applied the three *Connolly* factors and felt that the plaintiffs' showing under their Takings Clause challenge was insufficient to justify issuing a preliminary injunction. But it pointed out that it was making its ruling in the "exaggeratedly rapid atmosphere of a preliminary injunction proceeding." 855 F.Supp. at 1004. It suggested that the super-reachback provisions of the Coal Act must be "at the very edge of the broad range of permissible legislative allocation of specific economic burdens ... perhaps ... over the edge." *Id.* The *Templeton* court continued,

> The imposition of retiree health care costs on the Plaintiffs now, thirty or forty years after their exit from the industry, certainly has a draconian air about it. By no means does the court view the Plaintiffs' challenge to the Coal Act as a frivolous attack. However, the character of the decision to allocate responsibility for this economic burden to former participants in the industry does not seem to be different in character from the liability constitutionally imposed for Black Lung disease benefits, pension funding, and environmental contamination as discussed in the cases cited above. *Id.*

This Court has no more idea than the *Templeton* court where the line should be drawn in constitutional challenges to economic legislation. If the super-reachback provision of the Coal Act does not cross the line, it must step right up to it. Nevertheless, the Coal Act must be viewed as a rational legislative response to a crisis in coal retiree health benefits. It is the product of legislative thought, analysis and compromise and there is no evidence that Congress acted arbitrarily or without prior substantive investigation and debate. The fact that Blue Diamond ceased contributing to UMWA benefit trusts in 1964, should not relieve it of responsibility in this instance. It would be unfair if the lifetime health care costs of Blue Diamond's own retirees were to be born by its competitors in the coal industry. And, although the Coal Act also requires Blue Diamond to pay a proportionate share of financing the health care benefits of orphan retirees, who never were its employees, this aspect of the statute is, in fact, very similar to provisions already found constitutional in the MMPAA. Congress has weighed the alternatives and rationally determined that the costs of provid-

ing such benefits for orphan retirees should be borne by NBCWA coal operators who, at least at one time, voluntarily chose to participate in a multiemployer health care system.

### III. CONCLUSION

In conclusion, the Court FINDS that the super-reachback provision of the Coal Act violates neither the Due Process nor the Takings Clause of the Fifth Amendment to the United States Constitution. Blue Diamond's motion for summary judgment will be denied and the motions filed by the Secretary of Health and Human Services and by the Trustees of the Combined Fund will be granted.