LINDSEY COAL MINING COMPANY LIQUIDATING TRUST, by its Liquidating Trustees, H. Robert Lasday and Elaine K. Light, Plaintiffs,

v.

Donna E. SHALALA, Secretary, United States Department of Health and Human Services, and United Mine Workers of America Combined Benefit Fund, and its Trustees Marty D. Hudson, Michael Holland, Elliot A. Segal, Thomas O.S. Rand, Carlton R. Sickles, Gail R. Wilensky and William P. Hobgood, Defendants.

Civ. A. No. 94–143.

United States District Court, W.D. Pennsylvania.

Sept. 25, 1995.

**962**

Lukehart & Lundy, Jeffrey Lundy, Punxsutawney, PA, for plaintiff.

U.S. Department of Justice, Herbert E. Forrest, Brian G. Kennedy, Washington, DC, for defendant D.E. Shalala.

Houston Harbaubh, Ralph A. Finizio, Pittsburgh, PA, Morgan, Lewis & Bockius, Tracy L. Zurzolo, Washington, DC, Beins, Axelrod, Osborne, Mooney & Green, John R. Mooney, Washington, DC, for defendant UMW Benft. Fund.

### OPINION

and

### ORDER OF COURT

AMBROSE, District Judge.

This action for declaratory and injunctive relief challenges the constitutionality of the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C.A. §§ 9701–9722 (Supp.1995) (the "Coal Act"), as applied to Plaintiff Lindsey Coal Mining Company Liquidating Trust, also known as Lindsey Coal Mining Company, in Liquidation ("Lindsey Coal Trust"). Defendants are Donna Shalala, Secretary of the United States Department of Health and Human Services (the "Secretary"), and the United Mine Workers of America Combined Benefit Fund and its Trustees ("Trustees"). Pending before the Court are cross-motions for summary judgment filed by each of the parties. Plaintiff claims that it is not liable for any benefits due retired coalminers and their dependants pursuant to the Coal Act because it is not a "signatory operator" nor is it "in business" as required by the terms of the Coal Act. Plaintiff further contends that even if the Coal Act does apply, it violates the Procedural Due Process, Substantive Due Process, and Takings Clauses of the Fifth Amendment. Defendants contend that the Coal Act does apply because Plaintiff is the noncorporate continuation of Lindsey Coal Mining Company and that the Coal Act as applied here is not unconstitutional. After carefully considering all of the briefs and materials submitted by the parties in support of their motions and for the reasons set forth below, the Court concludes that the Lindsey Coal Mining Company continues to exist through Plaintiff for purposes of Coal Act liability, that the statutory requirements of the Act have been met, and that the Act, as applied here, does not violate the Procedural Due Process, Substantive Due Process, or Takings Clauses of the Fifth Amendment. Defendants' Motions for Summary Judgment will be granted and Plaintiff's Motion for Summary Judgment will be denied.

### I. Legal Standard.

Summary judgment may only be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Proc. 56(c). The parties contend, and the Court finds, that there are no genuine issues of material fact and that this case is appropriate for disposition via summary judgment.

### II. Factual Background.

#### A. The Coal Act.

The social and political underpinnings leading to the passage of the Coal Act have been set forth in great detail in the *Coal Commission Report: A Report to the Secretary of Labor and the American People* (November 1990), *see* Doc. # 21, Exh. 2, as well as by a number of courts that have considered the constitutionality of the Act. *See, e.g., In re Chateaugay Corp.*, 53 F.3d 478 (2d Cir.1995); *Barrick Gold Exploration, Inc. v. Hudson*, 823 F.Supp. 1395 (S.D.Ohio 1993), *aff'd*, 47 F.3d 832 (6th Cir.1995); *Templeton Coal Co. v. Shalala*, 882 F.Supp. 799 (S.D.Ind.1995); *In re Blue Diamond Coal Company*, 174

B.R. 722 (E.D.Tenn.1994); *see also Unity Real Estate Co. v. Hudson et al.,* 889 F.Supp. 818 (W.D.Pa.1995). The Coal Commission Report, together with the excellent discussion of the history of the Coal Act presented by Judge Healey in *In re Chateaugay Corp.,* 53 F.3d at 481–486, provide a thorough background to the legal issues presented in the instant action and need not be reiterated at length here. Briefly, the Coal Act was enacted by Congress in October of 1992 as a vehicle to combat a perceived crisis in the funding of UMWA health and pension benefit plans for thousands of retired UMWA coal miners and their dependents. The Coal Act created a new private trust fund, the UMWA Combined Benefit Fund (the "Combined Fund"), and places the burden of providing funding for the Combined Fund on those employers who have in the past voluntarily participated in collectively bargained multiemployer benefit plans established and funded by a series of National Bituminous Coal Wage Agreements ("NBCWAs") beginning in 1950. Congress determined that liability for the lifetime health (and other) benefits of the retired UMWA workers should fall on those "persons most responsible" for the "plan liabilities":

> In allocating financial responsibility for costs of the Combined Fund, Congress determined that "those companies which employed the retirees in question, and thereby benefitted from their services, will be assigned responsibility for providing the health care benefits promised in their various collective bargaining agreements." 138 Cong.Rec. § 17,603 (daily ed. Oct. 8 1992) (reproducing proposed conference committee report). Accordingly, Congress directed the Secretary of Health and Human Services to levy annual health insurance and death benefit insurance premiums on each "assigned operator." 26 U.S.C. §§ 9704, 9705. An "assigned operator" was defined as a signatory to any NBCWA since 1950. *Id.,* § 9701(c)(5). The Secretary of Health and Human Services "assigned" each beneficiary to the

signatory operator that longest employed the beneficiary. *Id.* Where the signatory operator is no longer in business, the liability for its beneficiaries passes to "related persons," such as successors in interest. *Id.,* §§ 9704(a), 9701(c)(2). The costs of providing health care benefits to the remaining unassigned operators were divided in proportion to their share of the assigned beneficiaries. *Id.,* § 9704.

In sum, the annual premium for an assigned operator equals the sum of the cost of providing health benefits to the company's assigned beneficiaries, and its pro rata share of the cost of health benefits for "orphaned" beneficiaries. The Coal Act restricts liability for medical benefit premiums to companies that (1) signed one or more Wage Agreements [NBCWAs] between 1950 and 1988, (2) continue to "conduct[ ] or derive[ ] revenue from any business activity, whether or not in the coal industry," and (3) actually employed at least one retiree currently receiving benefits. *Id.* § 9701(c).

*In re Chateaugay,* 53 F.3d at 485–86.

### B. Lindsey Coal Mining Co. and the Liquidating Trust.

Lindsey Coal Mining Company was incorporated in Pennsylvania in 1910 and engaged in numerous active coal mining operations in Pennsylvania during the next forty-two years. Lindsey Coal Mining Company employed UMWA-represented mine workers in its coal mining operations and generated profits from its business.

Lindsey Coal Mining Company, through its membership in the Central Pennsylvania Coal Producers Association ("CPCPA"), became a signatory to the 1947 NBCWA, the 1950 NBCWA and the February 1, 1951 amendment to the 1950 NBCWA. *See* Doc. # 21, Exh. 11, Lasday Dep. at 17–18.[1] It contributed approximately $230,000.00 to the multiemployer benefit fund established by these NBCWAs until 1952, when the Company ceased its active coal mining operations

---

1. Many of the exhibits referred to in this opinion have been produced separately by each of the parties. Where duplicated exhibits exist, the Court will cite to only one party's exhibit list. To avoid confusion and for ease of reference, the citation will include the document number where the exhibit can be found in the record.

and began leasing its properties to various coal and gas operators. Although it was no longer receiving revenue from active coal mining, it did collect royalties derived from coal and gas rights from the properties it had leased to other operators, as well as revenues from the sale of real estate and scrap metal. For the next twenty-two years, from 1952 until 1974, Lindsey Coal Mining Company acquired no additional assets and confined its activities to the sale and leasing of its previously held properties. The Company had no employees during this time except for a part-time secretary.

In 1974, the shareholders of Lindsey Coal Mining Company decided that it was no longer "desirable" to continue its leasing activities as a corporation in large part because of tax reasons and so resolved to liquidate the corporation "as promptly as possible." *See* Doc. # 15, Exh. H, Minutes and Resolution of Joint Meeting of Shareholders and Board of Directors of Lindsey Coal Mining Company. The dissolution of the Company was to be completed by Friday, April 11, 1975.

In March 1975, the shareholders of Lindsey Coal Mining Company entered into a trust agreement in order to "wind up the affairs" of the corporation as quickly as possible, and the agreement noted that "time [was] of the essence" regarding liquidation of the corporation's assets. *See* Doc. # 15, Exh. I, Deed of Trust at 1–2. The trust agreement provided for the transfer of all of the remaining corporate assets to a Liquidating Trustee, and granted the Trustee full corporate powers in the premises, including the power to, *inter alia:* retain any real or personal property; invest in all forms of property; purchase investments; repair, alter, improve or lease property; sell, exchange, or partition property; to borrow money; to allocate receipts to income or principal; to compromise claims, and to make distributions in kind. *See* Doc. # 15, Exh. I, Deed of Trust at 2. The corporate assets transferred to the Liquidating Trustee included Lindsey Coal Mining Company's real estate and mineral reserves.

Twenty years have passed since the Lindsey Coal Mining Company began liquidating its assets and winding up its corporate affairs, and to date the liquidation process has yet to be completed. In fact, liquidation is not expected to be completed for at least another two to four years, when all mineral resources and timber resources have been depleted or extracted. *See* Doc. # 21, Exh. 11, Lasday Dep. at 92. During the past twenty years, the Lindsey Coal Mining Company, through Plaintiff, derived revenue from coal and gas royalties, from the sale of several parcels of land, and from rental property. These activities generate an income of approximately $10,200 per month, which is collected by Plaintiff and distributed to the beneficiaries of the trust, the current shareholders of Lindsey Coal Mining Company. In addition, new coal and gas leases have been entered into by co-trustees of Plaintiff in the name of Lindsey Coal Mining Company as lessor.

In September of 1993, the Lindsey Coal Mining Company, through Plaintiff, was notified that it had been assigned liability for twenty-three of its former miners, their dependents or beneficiaries pursuant to the Coal Act. The first year's monthly premium was assessed in the amount of $6,667.34. Although Plaintiff vehemently disputes that it can be liable for Lindsey Coal Mining Company's obligations under the Coal Act, it has made timely payments to the Combined Fund to avoid the heavy penalties established by the Act for nonpayment of premiums. *See* 26 U.S.C.A. § 9707(b) (establishing penalty of $100 per day for nonpayment of premiums).

## III. *Discussion.*

### A. *Lindsey Coal Mining Company as "Signatory Operator".*

It is important to note at the outset that assigned operator liability is being assessed against the Lindsey Coal Mining Company and not against Plaintiff *per se.* Plaintiff, the Lindsey Coal Liquidating Trust, is the entity charged with the responsibility for winding up the affairs of Lindsey Coal Mining Company and satisfying its obligations, and so would be charged with satisfying any liability assessed against Lindsey Coal Mining Company pursuant to the Coal Act. Plaintiff

argues that because the Lindsey Coal Mining Company was dissolved in 1975 and transferred all of its assets at that time to Plaintiff, the Lindsey Coal Mining Company no longer exists and cannot be assessed liability under the Coal Act. Plaintiff argues further that since the only remaining entity is the Lindsey Coal Trust, and since the Lindsey Coal Trust does not fit within any of the categories of "related parties" under § 9701(c)(2), it cannot be assessed liability under the Coal Act as a "related person." Finally, Lindsey Coal Trust argues that it cannot be liable as a "successor in interest" because section 9706(b)(2) of the Coal Act provides for successor liability only for those persons who become successors after the Coal Act's enactment date.

■■■ The facts here present an unusual situation. On the one hand, Coal Act liability is being assessed against an entity that was technically dissolved over twenty years ago. Plaintiff at that time was created ostensibly solely for the purpose of liquidating the Lindsey Coal Mining Company's assets in as prompt a manner as possible. On the other hand, the process of liquidating the Company's assets and winding up its affairs has stretched over the course of more than two decades and is still incomplete. Lindsey Coal Mining Company, through Plaintiff, has entered into at least four new mineral and timber lease agreements since its dissolution and at least one timber sales agreement, generating income which is then collected by Plaintiff and distributed to beneficiaries of the Lindsey Coal Trust. *See, e.g.,* Doc. # 15, Exh. K, N. Social Security Administration earnings records reflect filings in the name of Lindsey Coal Mining Company, in Liquidation. Doc. # 15, Exh. R. Given the fact that the activities post-dissolution are precisely the same activities which generated income for Lindsey Coal Mining Company for twenty years before its dissolution, it is difficult to conclude that Lindsey Coal Mining Company no longer exists. Moreover, as noted by the Defendant Trustees, Pennsylvania law provides that a dissolved corporation continues to exist for certain purposes, including discharging its obligations, until all of its assets have been liquidated. *See* 15 Pa. C.S. § 1978(a). Because the liquidation process has not been completed, and because Lindsey Coal Mining Company, through Plaintiff, has continued to enter into new lease agreements, continues to generate income in the same manner it did before dissolution, and has maintained its own identity for twenty-five years after liquidation was said to have commenced, the Court is persuaded that Lindsey Coal Mining Company continues to exist through Plaintiff Lindsey Coal Trust for purposes of Coal Act liability.

## B. *"In Business" Under the Coal Act.*

■■■ In addition to being a signatory operator, the Coal Act requires that the operator remain "in business" in order for that operator to be assessed liability for premiums to the Combined Fund. 26 U.S.C.A. § 9706(a). Section 9701(c)(7) of the Coal Act provides:

> [f]or purposes of this Chapter, a person shall be considered to be in business if such person conducts or derives revenues from any business activity, whether or not in the coal industry.

26 U.S.C.A. § 9701(c)(7). Plaintiff contends that "entities such as Lindsey [Coal] Trust should be exempted from the broad inclusion of the Coal Act since the statutory intent appears to encompass only those parties regularly involved in the ongoing conduct of business with all indicia present as commonly associated with such conduct." Doc. # 23, Pl. Reply Memo. at 11. Plaintiff's argument ignores one of the two ways that a person may be considered to be "in business" for purposes of the Coal Act. A plain reading of the statute indicates that a person is "in business" if it (1) *conducts* any business activity, whether or not in the coal industry, or (2) *derives revenue from* any business activity. The Court is persuaded that Lindsey Coal Mining Company, through Plaintiff, still derives revenue from business activity by receiving royalty income from its mineral leases and rental income from real estate. Lindsey Coal Mining Company, through Plaintiff, has entered into four new mineral lease agreements over the past fifteen years. It "assigns infrequent timbering work to others every several years." Docket # : 23, Pl.

Reply Memo at 13. The revenues derived from these activities are collected by Plaintiff and then distributed to the beneficiaries of the Lindsey Coal Trust, who are the current shareholders of Lindsey Coal Mining Company, in Liquidation. Simply because Lindsey Coal Mining Company, as it continues to operate through Plaintiff, does not itself engage in activities such as property management, supervision, reclamation, advertising or marketing, or because it does not hold itself out as engaging in a trade or business does not persuade this Court that the revenue it generates is not revenue from "business activity", especially considering the fact that the business activity generating income now is precisely the same activity that generated income for the Company during the twenty years before Lindsey Coal Mining Company went into liquidation.

Plaintiff cites *In re Carpentertown Coal & Coke Co., Inc.,* 166 B.R. 279 (Bkrtcy.W.D.Pa. 1994) as support for its proposition that activities consisting solely of liquidation and reclamation are not "business activities" within the meaning of the Coal Act. That case, however, is factually distinguishable from the case at bar. As Judge Bentz noted in *In re Carpentertown,*

> the Debtor [assigned operator] has not conducted any business either in the coal industry or in any other respect since the commencement of its bankruptcy in 1989. Its activities have consisted solely of reclamation and liquidation. Any reclamation activity in which it engaged was conducted for the benefit of its creditors in order to avoid a large environmental claim or one for bond forfeiture. As each parcel of real estate was reclaimed, it was sold. As each item of equipment became no longer necessary for reclamation, it also was sold. No funds were reserved for the benefit of Debtor and it made no profit. The funds derived from the sale of equipment and real property have been held in escrow solely for the benefit of the creditors with valid claims against the estate. The Debtor did not conduct any activities for profit and cannot be considered to be "in business" under the Coal Act.

*In re Carpentertown,* 166 B.R. at 280–81. The same cannot be said of the activities performed by Plaintiff for Lindsey Coal Mining Company in this case. Lindsey Coal Mining Company has not been fully liquidated and does not expect to be fully liquidated for another three or four years. It receives royalty income from its mineral leases and rental income, all of which goes to the benefit of Plaintiff's beneficiaries. Plaintiff has not simply been engaged in liquidation but has entered into new mineral leases on behalf of Lindsey Coal Mining Company. The Court finds that *In re Carpentertown* is thus factually distinguishable and inapposite to the case at bar.

In sum, the statutory prerequisites of the Coal Act have been satisfied in that Lindsey Coal Mining Company, the assigned signatory operator, still exists and still conducts business activity through Plaintiff for purposes of satisfying its obligations under the Act. Further, the Coal Act's plain language, that a person is "in business" if that person derives revenues from any business activity, encompasses the activities of Lindsey Coal Mining Company as it continues to operate through Plaintiff. Lindsey Coal Mining Company is a signatory operator still in business and is subject to liability under the Coal Act.

### C. *Procedural Due Process.*

■ Plaintiff alleges that the Coal Act, as applied to it, constitutes a violation of the Procedural Due Process Clause of the Fifth Amendment because of a failure to provide for procedures to challenge the assignment of beneficiaries and the designation of signatory and assigned operators. *Complaint* at ¶ 43(B). After carefully considering the arguments advanced by the parties, the Court concludes that the Coal Act does not constitute a violation of the Procedural Due Process Clause of the Fifth Amendment for the reasons advanced by Defendant Trustees in their Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, *see* Docket #: 27 at 21–27, and by Defendant Shalala in her Brief in Support of Motion for Summary Judgment, *see* Docket #: 16 at 14–19. The procedures provided under the Coal Act and the Secretary's implementing regula-

tions for challenging the assignment of beneficiaries and the designation of signatory and assigned operators are more than adequate to satisfy the constitutional requirements of procedural due process.

### D. Substantive Due Process.

Plaintiff challenges the Coal Act, as applied, as violative of the Substantive Due Process Clause of the Fifth Amendment. Every court that has considered this constitutional challenge to the Coal Act has concluded that the statute does not constitute a violation of substantive due process. *See In re Chateaugay*, 53 F.3d at 486–491; *Unity Real Estate Co. v. Hudson*, 889 F.Supp. at 823–25; *Barrick Gold Exploration, Inc. v. Hudson*, 823 F.Supp. at 1401–03; *In re Blue Diamond Coal Co.*, 174 B.R. 722, 726–27; *Templeton Coal*, 882 F.Supp. at 811–13.

 A plaintiff challenging economic legislation on substantive due process grounds faces a very difficult hurdle. Legislation such as the one at issue here that "adjust[s] the benefits and burdens of economic life" are presumed constitutional, and a due process violation may only be established if it is shown that "the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); *see also Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984). This is true even though the legislation "upsets otherwise settled expectations and . . . even though the effect of the legislation is to impose new duties and liabilities based on past acts." *Usery*, 428 U.S. at 16, 96 S.Ct. at 2891. In other words, a statute will stand "if it bears a rational relationship to a legitimate government purpose." *Templeton Coal*, 882 F.Supp. at 811.

 It is clear that this standard is extremely deferential and does not depend upon "mathematical precision in the fit between justification and the means." *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, —— U.S. ——, ——, 113 S.Ct. 2264, 2287, 124 L.Ed.2d 539 (1993). Nor is Congress' *wisdom* in enacting particular legislation to achieve a legitimate objective at issue in substantive due process analysis. *Usery*, 428 U.S. at 18–19, 96 S.Ct. at 2893–94 ("whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension"). Rather, in enacting economic legislation, Congress has "absolutely no obligation to select the scheme that a court later would find to be the fairest, but simply one that was rational and not arbitrary." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 477, 105 S.Ct. 1441, 1457, 84 L.Ed.2d 432 (1985). As long as "a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." *R.A. Gray*, 467 U.S. at 729, 104 S.Ct. at 2717.

 Under this deferential standard, Plaintiff must show "that there is nothing in its past conduct that would make it rational to consider it 'responsible' for the 'plan liabilities.'" *Unity*, 889 F.Supp. at 824 (citing *Blue Diamond*, 174 B.R. at 726). Plaintiff here has failed to do this. The main thrust of Plaintiff's argument is that the Coal Act is irrational as applied to Plaintiff because it imposes liability on employers such as Plaintiff that had never actually promised lifetime benefits to its workers through the NBCWAs of the 1950s and 1960s.[2] As Judge Hull noted in *Blue Diamond*, however, Coal Act liability is not premised on the actual promise of lifetime benefits:

> The best [Plaintiff] can do is show that, in extending the reachback provision beyond that recommended by the Coal Commission [to pre–1974 NBCWA signatories], Congress apparently erroneously believed that [Plaintiff] and other contributors to pre–ERISA welfare and retirement funds

---

2. It was not until after the passage of ERISA in 1974 that NBCWA signatories actually promised lifetime benefits for its miners. Pre–ERISA signatories of NBCWAs of the 1950s and 1960s that were not signatories to post–1974 NBCWAs are often referred to as "super-reachback" companies. *See Blue Diamond*, 174 B.R. at 725.

had actually or effectively promised lifetime benefits to retirees and their beneficiaries. However, the actual Congressional finding which is mentioned in the legislation is not that [Plaintiff] and others like it had actually *promised* benefits but that they bore "responsibility" for the "plan liabilities." There is no doubt that, to some extent, they did. By ceasing to contribute to the UMWA trust fund after its contractual requirement to do so had expired, Blue Diamond created some of the "orphans" who became the responsibility of the remaining contributing operators. These orphaned miners continued to draw upon the funds and contributed to their financial instability.

*Blue Diamond,* 174 B.R. at 726. *See also Templeton Coal Co., Inc. v. Shalala,* 882 F.Supp. at 817 ("The relevant constitutional question is not whether Plaintiffs in fact made an express contractual 'promise' of lifetime health benefits, but rather, whether Congress has plausible grounds upon which to include signatory operators such as Plaintiffs within the Coal Act's financing scheme.") The Coal Act "triggers current and future liabilities on the basis of past actions, in this case the hiring and firing of workers and the signing of a National Bituminous Coal Wage Agreement." *Chateaugay,* 53 F.3d at 491. As Judge Smith noted in *Unity,* "[a]lthough reasonable minds certainly may differ over the wisdom of the means chosen by Congress, it cannot be said that Congress acted irrationally in passing the Coal Act." *Unity,* 889 F.Supp. at 824. Given the extreme deference applied to economic legislation by the Supreme Court, and given that it was rational for Congress to choose "to spread the costs of the Combined Fund's benefits to those employers who had profited from the labor of UMWA miners and who, at some time in their histories, had contributed to [UMWA] multi-employer welfare benefit funds", supra at 727, Plaintiff's substantive due process challenge cannot succeed.

E. *Takings Clause.*

■■■■ The Takings Clause of the Fifth Amendment forbids the government from taking property for public use without paying just compensation to the former owner. Its

purpose is to "bar the Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). The Supreme Court has observed that where a party's "due process arguments are unavailing, 'it would be surprising indeed to discover' the challenged statute nonetheless violating the Takings Clause." *Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2289, quoting *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986). "Given the propriety of the governmental power to regulate, it cannot be said that the Takings Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Id.* It is equally as clear that a "taking" does not occur merely because a statute interferes with the protections afforded to a claimant via contract. *Unity,* 889 F.Supp. at 825. *See also Connolly,* 475 U.S. at 223–24, 106 S.Ct. at 1025 ("Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity.")

■■■■ The Supreme Court has refused to develop a set formula for determining whether economic legislation violates the Takings Clause, relying instead on an "ad hoc, factual inquir[y] into the circumstances" of a particular case. *Connolly,* 475 U.S. at 224, 106 S.Ct. at 1025. This Court must attach "particular significance" to three factors" in conducting the requisite factual analysis: (1) the nature or character of the government action; (2) the economic impact of the statute; and (3) the statute's interference with distinct, investment-backed expectations. *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026.

1. *The Nature of Character of the Government Action.*

■■■■ The Supreme Court has observed that "the nature of the State's action is criti-

cal in takings analysis." *Keystone Bituminous Coal Association v. DeBenedictis*, 480 U.S. 470, 488, 107 S.Ct. 1232, 1243, 94 L.Ed.2d 472 (1987). "It is well-settled that a 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* (quoting *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659 (citations omitted)). With respect to the nature of the governmental action involved—that is, requiring assigned operators to pay a share of the costs of providing health care benefits to UMWA retirees—the Coal Act entails no physical invasion of property, nor any permanent confiscation of Plaintiff's assets for governmental use. Rather, by requiring assigned operators to contribute to the Combined Fund so as to insure health benefits for the Coal Act's beneficiaries, "Congress has merely enacted legislation designed to ensure the continuation of a health benefits program from which many assigned operators had attempted to walk away. This requirement does not give rise to any claim for just compensation under the Takings Clause." *Templeton*, 882 F.Supp. at 823. This first factor thus weighs against finding an unconstitutional "taking."

### 2. *Economic Impact of the Governmental Regulation.*

Regarding the economic impact of the Coal Act on Plaintiff, it is undisputed that the Coal Act will require Plaintiff to pay out over 60% of the income that is currently being received from the mineral, gas and timber rights and rental income. While certainly severe, "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe*, —— U.S. at ——, 113 S.Ct. at 2291 (requirement of having to "pay out 46% of shareholder equity" to satisfy its obligations under the MPPAA considered insufficient to demonstrate a taking); *see also Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (approximately 75% diminution in value insufficient) and *Hadacheck v. Sebastian*, 239 U.S. 394, 405, 36 S.Ct. 143, 144, 60 L.Ed. 348 (1915) (92.5% diminution in value insufficient).

In any event, the primary consideration in assessing the severity of the economic impact is the relationship between the employer and the plan, that is, the extent to which the liability imposed on the employer will be "out of proportion to its experience with the plan." *See Connolly*, 475 U.S. at 225–26, 106 S.Ct. at 1026–27 ("The assessment of withdrawal liability is not made in a vacuum, however, but directly depends on the relationship between the employer and the plan to which it had made contributions.") *See also Unity*, 889 F.Supp. at 830 (in analyzing economic impact, primary consideration is the economic nexus between the burden and the party burdened by the statute); *In re Chateaugay*, 53 F.3d at 494 ("where a regulation mandates contributions to a benefit fund, the proper yardstick of economic impact is that of proportionality").

This Court is persuaded that the assessment of Coal Act liability is not made in a vacuum but "is directly related to the employment relationship between each NBCWA signatory and their previous employees and a proportionate share of the health benefits of orphan retirees." *Templeton*, 882 F.Supp. at 823. As the Court in *In re Chateaugay* stated:

[T]he employment relationship supplies the rational link by which [Plaintiff's] premiums are tied to its past experience with the benefit plans. As with the other signatory operators, the size of [Plaintiff's] annual contribution depends entirely on the number of its former employees receiving benefits from the Combined Fund. By thus mooring a given company's funding obligations to a legitimate measure of its prior benefit from the UMWA health care system, the Coal Act rationally apportions future financial responsibility according to past participation. Consequently, we are not confronted with a case of Congress " 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Penn Central*, 438 U.S. at 123–24, 98 S.Ct. at 2658–59.

*In re Chateaugay,* 53 F.3d at 494. Moreover, as in *Connolly,* the Coal Act has significant provisions intended to mitigate the costs of providing benefits to the industry's "orphaned" retirees:

First, the transfer of $210 million from the 1950 Pension Fund in the Combined Fund's first three fiscal years will eliminate the unassigned beneficiary and death benefit premiums for all assigned operators in at least the first two of those years. The second series of transfers from the Abandoned Mine Reclamation Fund will continue until at least 2004, potentially totalling hundreds of millions of dollars. By thus minimizing [Plaintiff's] financial responsibility for retirees it never employed, the Coal Act reinforces the centrality of the employment relationship to the imposition of liability.

*In re Chateaugay,* 53 F.3d at 494–95. The Court finds that this factor also weighs against finding an unconstitutional "taking."

### 3. *Interference with Investment–Backed Expectations.*

Finally, this Court must consider the degree of interference with a claimant's reasonable, investment-backed expectations. This factor weighs somewhat in favor of finding an unconstitutional taking. It is true that "[m]aintaining economic stability in the coal industry has long been a matter of federal concern" and that it was "reasonably foreseeable that Congress would take action to ensure that the UMWA benefit trust would remain solvent and capable of meeting its obligations." *Blue Diamond,* 174 B.R. at 728. On the other hand,

it was a good deal less foreseeable that the legislation chosen to solve the problem would reach back to conduct which occurred almost [40] years ago in order to enforce a promise [Lindsey Coal Mining Company] never actually made.

*Id.* Weighing this factor against the other two factors discussed previously, however, does not persuade this Court that the interference with Plaintiff's investment-backed expectations necessarily rises to the level of an unconstitutional taking. This is certainly a close case, and it is difficult to determine exactly where the constitutional line-drawing must take place. However,

it is by no means clear that, in all fairness and justice, the public rather than past and present NBCWA signatories, should shoulder the responsibility for rescuing the 1950 and 1974 UMWA Benefit Trusts and for ensuring that retired UMWA miners receive the lifetime health benefits promised to them by later NBCWA signatories. It is a coal industry problem which should be solved by the coal industry. Coal operators like [Lindsey Coal Mining Company] contributed to the problem and should be part of the solution.

*Blue Diamond,* 174 B.R. at 729.

This Court is aware that Judge Smith of this Court has concluded that the liabilities imposed by the Coal Act amounted to an unconstitutional "taking" under the facts presented in *Unity Real Estate v. Hudson, supra.* Judge Smith in *Unity* issued a preliminary injunction on the basis that the Coal Act violated the Takings Clause in order to prevent the immediate, looming bankruptcy of Unity as a result of having its Coal Act obligations enforced against it. Several factors distinguish *Unity* from the case at bar. First, Judge Smith found it significant that application of the Coal Act to Unity would have resulted in its liquidation within the first several months of payments under the Act. *Unity,* 889 F.Supp. at 829. No such drastic impact has been alleged here. Second, Judge Smith found that Unity's Coal Act obligation was out of proportion to its experience with the Benefit Trusts or with the NBCWAs. Unity had *no* experience with the Benefit Trusts or the NBCWAs because its Coal Act liability "hinge[d] solely on the fact that, pursuant to 26 U.S.C. § 9701(c), it is a "related person" to two coal mining companies (a predecessor of Unity, and a former, bankrupt subsidiary of Unity) that ceased to do any business in the coal industry over ten years prior to passage of the Coal Act." *Id.* at 830–31. It was therefore "once removed" from having any experience at all with the NBCWAs, and Judge Smith concluded that there simply was an insufficient "connection" between the drastic burden being imposed upon Unity and its

(lack of) experience in the Benefit Trusts or NBCWAs. *Id.* Unlike the situation in *Unity,* the situation here is different in that Coal Act liability is being assessed against Lindsey Coal Mining Company as the assigned operator, which had direct (albeit limited) experience with the NBCWAs. Thus, the decision in *Unity* regarding the takings analysis does not compel a similar conclusion here.

Given the fact that economic legislation such as the Coal Act carries with it a presumption of constitutionality, and given that the first two factors in the takings analysis discussed above weigh in favor of finding the Coal Act constitutional as applied here, the Court finds that the Coal Act does not amount to an unconstitutional "taking" in violation of the Fifth Amendment.

In conclusion, the Court finds that the Lindsey Coal Mining Company continues to exist through Plaintiff for purposes of Coal Act liability, that the statutory requirements of the Coal Act have been met, and that the Act, as applied here, does not violate the Procedural Due Process, Substantive Due Process, or Takings Clauses of the Fifth Amendment. Defendants' Motions for Summary Judgment will be granted and Plaintiff's Motion for Summary Judgment will be denied.

### ORDER OF COURT

**AND NOW,** this 25th day of September, 1995, after careful consideration and for the reasons set forth in the Opinion accompanying this Order, it is hereby **ORDERED** that the Motion for Summary Judgment filed by Plaintiff Lindsey Coal Mining Liquidating Trust (Docket # : 11) is hereby **DENIED.**

It is further **ORDERED** that the Motions for Summary Judgment filed by Defendants Donna E. Shalala and by the United Mine Workers of America Combined Benefit Trust and its Trustees (Dockets # : 14 and 18) are **GRANTED.**

Defendant Shalala's request for counsel fees is hereby **DENIED.**